## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CITIZENS PROJECT, COLORADO
LATINOS VOTE, LEAGUE OF WOMEN
VOTERS OF THE PIKES PEAK REGION,
and BLACK/LATINO LEADERSHIP
COALITION,

   *Plaintiffs*,

v.

CITY OF COLORADO SPRINGS, OFFICE
OF THE CITY CLERK OF COLORADO
SPRINGS, and SARAH BALL JOHNSON,
in her official capacity as City Clerk,

   *Defendants*.

No. 22-cv-_____

## COMPLAINT

  Plaintiffs Citizens Project, Colorado Latinos Vote, League of Women Voters of the Pikes

Peak Region, and Black/Latino Leadership Coalition (together, "Plaintiffs"), bring this action

against the City of Colorado Springs ("City"), the Office of the City Clerk of the City of

Colorado Springs, and Sarah Ball Johnson, in her official capacity as City Clerk of the City of

Colorado Springs (together, "Defendants"), and allege the following:

## INTRODUCTION

  1. The Supreme Court recognized long ago that "the date of an election is covered

by the [Voting Rights Act]." *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 174

(1985); *see also, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 (2021) ("§ 2

[of the Act] applies to generally applicable *time*, place, or manner voting rules" (emphasis

added)).  *When* an election is held—just as *where* or *how* an election is held—may result in

unlawful racial discrimination.

1

2.      Colorado Springs is nearly alone among Colorado cities and towns in choosing to hold its municipal elections in April of odd-numbered years.  Only three of the 25 most populous Colorado cities or towns adhere to this schedule.  Most Colorado municipalities hold their local elections in November and have done so for decades.

3.      The timing of Colorado Springs' elections for City Council and Mayor massively disadvantages Hispanic and Black residents.  Only about 16% of the City's non-white registered voters participate in these April off-year elections.  In contrast, the turnout rate for white registered voters is around 32%.  This racial disparity dwarfs those often seen in Voting Rights Act cases.  *See, e.g.*, *Brnovich*, 141 S. Ct. at 2345 ("roughly 99% of Hispanic voters . . . who voted on election day cast their ballots in the right precinct, while roughly 99.5% of non-minority voters did so").

4.      The unusual timing of Colorado Springs' municipal elections causes this enormous racial disparity.  In elections held in November of even-numbered years, the turnout rate of the City's non-white registered voters surges to an average of about 64%.  The turnout rate of white registered voters rises in November on-year elections, too, but not so dramatically. The ratio of non-white turnout to white turnout therefore spikes by an average of 30 percentage points in November on-year elections—a huge reduction in the racial disparity.

5.      The unusual timing of Colorado Springs' municipal elections interacts with other aspects of the City's electoral system to exacerbate the impact on Hispanic and Black residents. In particular, three of the nine members of the City Council are elected at large, as is the Mayor. "[A]t-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities," and are therefore often unlawful even when not combined with elections held at inconvenient times.  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

6.     Hispanic and Black residents are also starkly underrepresented in the City's government.  Over the last decade, more than 90% of the successful candidates for City Council and Mayor were white.  Not a single Hispanic or Black candidate prevailed in an at-large election for City Council.  The City's government is less responsive to the needs and interests of Hispanic and Black residents, too.  Their concerns about police violence, public health, education, housing, and city funding decisions have been pervasively ignored.

7.     Colorado Springs' choice to hold its municipal elections in April of odd-numbered years saves the City no time, money, or work.  To the contrary, the City is forced to devote considerable resources to administering additional elections.  If the City instead consolidated its municipal elections with county, state, and federal elections—following the lead of many Colorado cities and towns—it would avoid these extra obligations.

8.     Nor does the unusual timing of Colorado Springs' municipal elections improve the quality of the City's government.  In fact, local officeholders elected in off-cycle elections are less accountable to their constituents for their records in office.  The use of off-cycle elections also causes local officeholders to take policy positions that are less congruent with those of their constituents.

9.     The City's decision to hold April off-year elections is especially problematic in light of its own Council's declaration that "the City's power and authority is derived from, and remains accountable to, the collective will of the voters."  Colo. Springs Code of Ordinances § 5.1.301.  The Council has directly acknowledged the relationship between voter turnout and good governance, declaring that "the key to good government is an engaged and informed electorate," *id.*, and that "self-government by election is more legitimate and better accepted as

voter participation increases," *id.* § 5.1.109.  Yet the City continues to hold April off-year elections that squarely undermine that goal.

10.     Because of this election timing, the City's "political processes . . . are not equally open to participation by" Hispanic and Black residents, in that these individuals "have less opportunity than other members of the electorate to participate in the political process."  52 U.S.C. § 10301(b).  This burden is inextricably linked to social and historical conditions of racial discrimination in Colorado Springs.  The City's Hispanic and Black residents have long endured, and continue to experience, discrimination in income, housing, education, health, and public transportation.  The City's election timing interacts with these social and historical conditions to deny and abridge the right to vote on account of race in violation of the Voting Rights Act.

## PARTIES

11.     Plaintiff Citizens Project is a nonpartisan, non-profit organization founded in 1992 to oppose Colorado's Amendment 2, which sought to prohibit laws protecting LGBTQ citizens from discrimination.  Citizens Project's mission has evolved, and today it advocates for equity, inclusion, and justice in the Pikes Peak region.  For the past 30 years, Citizens Project has worked to build a vibrant democracy in the region, in which individual rights are protected, differences are respected, and people are encouraged to fully participate in civic and community life.  To this end, Citizens Project promotes active civic engagement for all.  It believes that a vibrant democracy requires that voters be informed, have access to elected leaders, and participate in shaping public policy.  Citizens Project advocates for the protection of local democracy by protecting the right to vote, hosting educational forums, publishing voter guides, and working collaboratively with the community to promote equitable and just public policy.

12.     Citizens Project has multiple programs to effectuate these goals.  It dedicates resources to promote voter engagement including: nonpartisan "get out the vote" work through postcard writing, canvassing, and other outreach efforts; election education efforts focused on local elections that are often underreported by traditional media, including surveying candidates, hosting issue and candidate forums, and publishing voter guides; publication of an annual El Paso County Legislator Report Card; and monitoring local and state government and marshaling the community to advocate for or against proposed legislation and policy.  Its other programmatic initiatives include responding to incidents in the community that impact equity, inclusion, and justice; hosting anti-racism training and small group conversations on racial issues; conducting separation of church and state training for local educators; and hosting community conversations and town halls on salient issues that affect its mission.

13.     The discriminatory impact of the timing of Colorado Springs' municipal elections directly burdens and affects Citizens Project's equity-oriented mission and the right to vote of the groups it seeks to serve.  April off-year elections make it substantially more difficult for Citizens Project to continue in its civic-engagement activities and to further its mission by diverting time, money, and resources from its other voter engagement activities, activities on other issues to advance its mission, and its day-to-day operations.  Citizens Project's budget provides for a limited staff of 2.5 full-time employees, and it relies, to a substantial degree, on organizing volunteers to deliver many of its services.

14.     April off-year elections require Citizens Project to engage in duplicative "get out the vote" efforts, which it already performs for November elections.  These duplicative "get out the vote" activities divert capacity from Citizens Project's other programmatic priorities.  Additionally, April off-year elections overlap with the Colorado state legislative session,

diverting limited employee and volunteer capacity from Citizen Project's legislative watchdog activities. Due to Citizen Project's limited budget and staff, it must deprioritize these other activities preceding April off-year elections, despite continued community need and demand during that time of the year.

15.     Plaintiff Colorado Latinos Vote is a nonpartisan, non-profit organization that was founded in 2020 to encourage members of Colorado's Latino community to register and vote in Colorado. Colorado Latinos Vote works to empower and educate members of the Latino community in southern Colorado (including Colorado Springs) so they can participate in the democratic process. It encourages its members to vote in every election, including Colorado Springs' April off-year elections.

16.     Colorado Latinos Vote emphasizes voter engagement initiatives. Promoting voter engagement and civic participation among its members is a fundamental part of Colorado Latinos Vote's work. In partnership with the League of Women Voters of the Pikes Peak Region, Colorado Latinos Vote organized volunteers to provide voter registration resources at the recent Cinco de Mayo cultural fair in Colorado Springs. It will continue these joint efforts in August and September by working with high schools and colleges in southern Colorado to host voter registration events to register eligible students and educate them about how they can effectively exercise their right to vote. Colorado Latinos Vote has also contacted the Colorado Secretary of State's office to encourage enforcement of certain statutory requirements for high schools to provide voter registration resources on campus.

17.     Colorado Latinos Vote also works to increase voter turnout among the Latino community. It is currently working with the Secretary of State's office to identify new locations for ballot drop boxes that are more accessible to members of the Latino community. It is

planning a "get out the vote" effort in advance of the November 2022 election that will include placing educational posters in businesses and public spaces in Latino communities and neighborhoods and canvassing to increase voter awareness and engagement.  If financial resources permit, it may hire paid canvassers to supplement these other efforts.  Colorado Latinos Vote plans to engage in similar efforts in advance of the April 2023 Colorado Springs municipal election.

18.     Beyond its voter engagement work, Colorado Latinos Vote has built relationships with other Latino groups across the state—including the Colorado Latino Leadership, Advocacy & Research Organization ("CLLARO") and the Latino Action Council—to coordinate civic engagement efforts and ensure that the Latino community in southern Colorado is represented in these organizations.  Colorado Latinos Vote is also reaching out to Latino political candidates on a nonpartisan basis to understand how it can support their candidacies and increase their exposure in the Latino community.  Colorado Latinos Vote plans to increase its involvement with Latino youth by recruiting additional members to lead outreach to that community through social media.  It is also investigating whether high schools are following curricular requirements related to diversity and inclusion.

19.     The discriminatory impact of the timing of Colorado Springs' municipal elections directly burdens Colorado Latinos Vote's mission to increase voter participation among the Latino community in southern Colorado and to protect individual community members' right to vote.  Moreover, Colorado Springs' April off-year elections make it substantially more difficult for Colorado Latinos Vote to continue in its civic engagement activities and to further its mission by diverting time, money, and resources from its other voter engagement activities and day-to-

day activities both in Colorado Springs and surrounding communities.  Colorado Latinos Vote currently relies entirely on volunteers to perform its work and has a limited budget of $3,450.

20.     April off-year elections require Colorado Latinos Vote to engage in duplicative "get out the vote" efforts in addition to the work it already does in advance of November elections, including voter registration drives, canvassing, and other engagement efforts.  These duplicative "get out the vote" activities divert capacity from Colorado Latinos Vote's efforts in southern Colorado communities other than Colorado Springs and other programmatic priorities such as supporting Latino political candidates.  Due to Colorado Latinos Vote's limited budget and volunteer capacity, it must deprioritize these other activities preceding April off-year elections, despite continued community need and demand during that period.

21.     Plaintiff League of Women Voters of the Pikes Peak Region ("LWV") is the Colorado Springs-based chapter of the League of Women Voters of the United States, a nonpartisan, non-profit entity founded in 1920 to improve our system of government and impact public policies through citizen education and advocacy.  The Pikes Peak chapter has been active since 1937.  The League of Women Voters has two separate and distinct roles.  First, it provides voter services and citizen education, which entails presenting unbiased nonpartisan information about elections, the voting process, and issues.  Second, it establishes positions on various issues of public importance and uses its positions to advocate for or against certain policies in the public interest.  These functions serve its dual mission of empowering voters and defending democracy.

22.     The LWV undertakes various activities to advance its mission.  Its Voter Services Team arranges for volunteers to register voters in high schools, libraries, and at naturalization ceremonies, present nonpartisan ballot information in public forums, and work to "get out the

vote" with postcards, phone, and text banking.  LWV volunteers also produce local content to supplement the national League of Women Voters' online voter guide, VOTE411.org.  The LWV's Advocacy Team researches issues of public interest and takes positions at the local, state, and national levels.  Locally, the Pikes Peak chapter has taken positions on parks, water quality, and health care, among other topics.  After taking a position, the Team organizes grassroots advocacy efforts like phone campaigns to express positions to elected officials and events to promote awareness.

23.     The discriminatory impact of the timing of Colorado Springs' municipal elections directly burdens the LWV's voter services function by requiring additional effort to engage minority voters.  Moreover, April off-year elections make it substantially more difficult for the LWV to continue in its civic engagement activities and to further its mission by diverting time, money, and resources from its other voter engagement, advocacy, and day-to-day activities.  The LWV is operated mostly by volunteers (there is one part-time paid staff member), and it has a limited budget to dedicate to voter services related expenses like postcards and mailers.

24.     April off-year elections require the LWV to engage in duplicative "get out the vote" efforts, which it already performs for November elections.  These activities include postcard writing, texting events, community voter education, and other engagement efforts.  These duplicative "get out the vote" activities divert capacity from the LWV's other programmatic priorities.  Due to the LWV's limited budget and volunteer capacity, it must deprioritize these other activities preceding April off-year elections, despite continued community need and demand during that period.

25.     Plaintiff Black/Latino Leadership Coalition ("BLLC") is a nonpartisan, non-profit organization formed in 2006 in response to a lack of representation in civic decision making and

access to information about matters vital to raising the quality of life for people of color in Colorado Springs and the Pikes Peak region.

26.     BLLC is devoted to promoting and advocating for positive change by bringing awareness to marginalized people on a variety of issues, policies, and programs available to them and by addressing their needs in the Pikes Peak region.  Its purpose is to enhance political, economic, and social cooperation between Black and Latino people.

27.     In the runup to each election, BLLC engages in several programmatic activities to boost voter turnout, especially in the Hillside region of Colorado Springs.  BLLC partners with Urbanites Leading the Pikes Peak Region, a Hillside-based social services organization, to set up a voter information booth staffed by BLLC volunteers.  The volunteers register voters, explain ballot issues, and encourage voter turnout.

28.     BLLC also invites candidates for office to speak to its membership.  BLLC promotes these events through word of mouth and on social media.

29.     Beyond its election-related work, BLLC undertakes myriad activities to improve the quality of life of people of color in Colorado Springs, including monitoring proposed housing developments, attending City Council, Board of Education, and El Paso County Commission meetings, working with the local jail system on mental health issues, opposing school closures, and monitoring infrastructure needs, particularly in Hillside and the Southeast.

30.     April off-year elections require BLLC to engage in duplicative voter turnout and education activities, which it already performs for November elections.  These duplicative voter turnout activities divert capacity from the BLLC's other programmatic priorities.  BLLC has five active members and an organizational budget of about $1,500.  Due to BLLC's limited budget

and volunteer capacity, it must deprioritize these other activities preceding April off-year elections, despite continued community need and demand during that period.

33. Defendant City of Colorado Springs is a municipality in El Paso County, Colorado. As a home rule city, Colorado Springs has authority under the Colorado Constitution to regulate "[a]ll matters pertaining to municipal elections." Colo. Const. art. 20, § 6(d). These matters include "the date of such election or vote." *Id.*

32. Defendant Office of the City Clerk of Colorado Springs is responsible for conducting municipal elections, at the direction of the City Clerk. Colo. Springs Code of Ordinances § 1.2.506.

33. Defendant Sarah Ball Johnson is the City Clerk for the City of Colorado Springs. As City Clerk, she is responsible for conducting municipal elections. *Id.* Specifically, her duties include establishing procedures for the conduct of municipal elections, *id*. § 5.1.112(F), providing a written timetable for each municipal election that includes the election date, *id*. § 5.1.113(J), providing notice of each municipal election that specifies the election date, *id*. § 5.1.114(A), and supervising the conduct of municipal elections, *id*. § 5.1.112(C). She is sued in her official capacity.

## JURISDICTION AND VENUE

34. This action arises under the laws and Constitution of the United States. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201, and 2202, and 42 U.S.C. § 1983.

35. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred or will occur here.

**FACTS**

**Unusual Election Timing**

36.     Under Colorado law, the "regular" municipal election is presumptively "held . . . on the first Tuesday of November."  Colo. Rev. Stat. Ann. § 31-1-101(10)(a).  This is when Colorado Springs' elections for City Council and Mayor would be held if the City had not deviated from the state law default.  If the City decided to change the date of its municipal elections in the future, it would be compelled to hold November elections.  *Id.* § 31-10-109(1)(a).

37.     Prior to the enactment of the current state law framework, Colorado Springs exercised its discretion as a home rule city to elect its municipal officials, including the City Council and Mayor, "on the first Tuesday in April in each odd-numbered year."  Colorado Springs City Charter art. XI, § 20 (1979).  This timing choice remains in effect even though Colorado municipalities are now forbidden from adopting it in the first instance.  *See* Colo. Rev. Stat. Ann. §§ 31-1-101(10)(b); 31-10-109(1).

38.     Colorado Springs' decision to hold April off-year municipal elections is highly unusual among Colorado cities and towns.  Of Colorado's 25 largest municipalities, 20 hold their local elections in November.  Only two other municipalities (Fort Collins and Grand Junction) use the same election schedule as Colorado Springs.

39.     Colorado Springs' outlier status has persisted for decades.  In 1986, for example, 19 of Colorado's 25 largest municipalities held their local elections in November.  Only three of those municipalities other than Colorado Springs held April off-year local elections.

40.     Colorado Springs' adherence to April off-year municipal elections pits it firmly against the national trend.  Arizona, California, Nevada, and Virginia all recently passed laws moving municipal elections to November.  These efforts are not partisan.  The Arizona state

government, under Republican control, and the California state government, under Democratic control, enacted nearly identical measures.

41.     At the local level, municipalities of all shapes and sizes independently switched to November elections over the last decade.  The jurisdictions abandoning non-November elections include Austin, Texas; Baltimore, Maryland; Black Mountain, North Carolina; El Paso, Texas; Jersey City, New Jersey; Johnson City, Tennessee; Lake Orion, Michigan; Los Angeles, California; Maplewood, Minnesota; Monument, Colorado; Raleigh, North Carolina; Santa Fe, New Mexico; Sarasota, Florida; Trenton, New Jersey; and Takoma Park, Maryland.  In New Jersey alone, 45 municipalities aligned their local elections with state elections.

### Voting Rights Act Application

42.     It has long been clear that the Voting Rights Act applies to election timing and may require changes to when elections are held.  All three branches of the federal government have confirmed this understanding.

43.     When Congress amended Section 2 of the Voting Rights Act in 1982, giving the provision its current form, the Senate Subcommittee on the Constitution stated in its report that the use of "off-year elections" was an example of a practice "which might serve as a basis for court-ordered changes of systems for electing members of" legislative bodies.  S. Rep. No. 97-147 at 153-54 (1982).  "[O]ff-year elections" were identified as an "objective factor" of discrimination relied upon by the Department of Justice.  *Id.* at 143-44.  And the Subcommittee reported that "'off-year' elections tend to result in disproportionately low voter turn-out among minorities."  *Id.* at 144 n.137.  And the Subcommittee also knew that the Department of Justice had previously objected to jurisdictions' election timing on at least eleven occasions.  *Hearings*

*Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary on Bills to Amend the Voting Rights Act of 1965*, Vol. 2, 97th Cong. 689 (1982).

44.     The Subcommittee knew that before the 1982 amendments to the Voting Rights Act, the Department of Justice had repeatedly denied preclearance under Section 5 of the Act when unusually scheduled elections threatened to disadvantage minority voters.  After 1982, the Department continued to monitor and object to changes in election timing.  For instance, the Department denied preclearance to an election schedule chosen "without any apparent consideration or serious solicitation of the views of the black community."  Legality of Augusta, Ga. Date for Consolidation Election, Op. Att'y Gen. (1988).  The Department likewise found on several occasions that moving election dates would diminish minority voters' ability to participate in the political process and their opportunity to elect candidates of their choice.  *See, e.g.*, Legality of Augusta, Ga. Date for Municipal Election, Op. Att'y Gen. (2012); Legality of Lee Cnty., S.C. Date for Special Election, Op. Att'y Gen. (1994); Legality of Cumberland Cnty. Sch. Dist., N.C. Election Schedule, Op. Att'y Gen. (1985); Legality of Miss. Date for Primary Election, Op. Att'y Gen. (1983).

45.     Federal courts, too, have indicated that the timing of elections may violate the Voting Rights Act where it has a racially discriminatory impact.  "[T]he date of an election is covered by the Act."  *Hampton Cnty. Election Comm.*, 470 U.S. at 174; *see also, e.g.*, *Garcia v. Guerra*, 744 F.2d 1159, 1165 (5th Cir. 1984) ("[A]bandoning the usual . . . date for school elections . . . had the effect of depriving substantial numbers of Hispanic voters of the right to vote in the election."); *United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 444 (S.D.N.Y. 2010) (the city's "practice of holding local elections 'off-cycle' in March . . . enhance[d] the opportunity for discrimination against the Hispanic voting population").

**Disparate Racial Impact**

46.    The April off-year timing of Colorado Springs' municipal elections interacts with social and historical conditions of discrimination to cause an enormous racial disparity in turnout.  In the City's last three municipal elections (2017, 2019, and 2021), the turnout of Hispanic registered voters was approximately 17%, 19%, and 12%, respectively.  In contrast, the turnout of white registered voters was approximately 34%, 36%, and 26%, respectively.

47.    The ratio of Hispanic turnout to white turnout was thus about 50% in 2017 (17% divided by 34%).  Similarly, the ratio of Hispanic turnout to white turnout was about 53% in 2019 and about 45% in 2021.  In other words, on average, Hispanic registered voters were *less than half* as likely as white registered voters to participate in Colorado Springs' April municipal elections.

48.    In contrast, the turnout of Hispanic registered voters surged to roughly 72% in the November 2016 election, 50% in the November 2018 election, and 69% in the November 2020 election.  The turnout of white registered voters also increased in these November elections, but not as sharply.  As a result, the ratio of Hispanic turnout to white turnout was roughly 83% in 2016, 71% in 2018, and 82% in 2020.  Put differently, the racial disparity in turnout between Hispanic and white registered voters shrank by 18 to 38 percentage points in these November elections—a striking improvement.

49.    Black registered voter turnout largely resembles Hispanic registered voter turnout. In the City's 2017, 2019, and 2021 municipal elections, the turnout of Black registered voters was approximately 17%, 18%, and 13%, respectively.  The ratio of Black turnout to white turnout was about 50%, 50%, and 48%, respectively.  Like that of Hispanic voters, Black registered voter turnout markedly increased in November elections, jumping to about 73% in

2016, 52% in 2018, and 68% in 2020.  As a result, the ratio of Black turnout to white turnout in

2016, 2018, and 2020 increased to 84%, 74%, and 81%, respectively.

50.     All of these figures are essentially identical if the turnout of all non-white (rather

than only Black or Hispanic) registered voters is compared to the turnout of white registered

voters.  In the City's 2017, 2019, and 2021 municipal elections, the turnout of non-white

registered voters was approximately 17%, 19%, and 12%, respectively, whereas in the November

2016, 2018, and 2020 elections, their turnout was approximately 72%, 51%, and 69%,

respectively.  The ratio of non-white turnout to white turnout was around 49%, 52%, and 46% in

Colorado Springs' 2017, 2019, and 2021 municipal elections, respectively.  This ratio spiked to

around 84%, 72%, and 83% in the November 2016, 2018, and 2020 elections, respectively.

### Interaction with Other Practices

51.     The unusual timing of Colorado Springs' municipal elections interacts with other

features of the City's electoral system to aggravate its impact on minority residents.  One of

these features is the City's reliance on at-large elections.  Under conditions of racially polarized

voting, at-large elections tend to produce maximal representation for the racial or ethnic

majority—and no representation at all for the minority.  *See, e.g.*, *Gingles*, 478 U.S. at 47.  The

City elects three of its nine City Council members through at-large elections.  The Mayor is also

elected in this way.  *See* Colorado Springs City Charter art. II, § 10(a)(1).

52.     Colorado Springs also requires an outright majority of the vote, as opposed to a

plurality, to prevail in a mayoral election.  *See id.*  Majority vote requirements disadvantage

minority voters when their candidate of choice could win a plurality of the vote but not a

majority in a multicandidate field.  *See, e.g.*, *Gingles*, 478 U.S. at 56 (noting that "majority vote

requirements" are "potentially dilutive electoral devices").

53.     Colorado Springs also holds nonpartisan municipal elections, in which candidates may not declare a party affiliation or preference.  *See* Colorado Springs City Charter art. XI, § 30 (1979).  Minority-preferred candidates often do worse in nonpartisan elections because they are unable to take advantage of party labels that would resonate with many voters.  *See, e.g.*, Legality of Kinston, N.C. Change to Nonpartisan Elections, Op. Att'y Gen. (2009) (denying preclearance where a municipality sought to switch from partisan to nonpartisan local elections).

54.     Additionally, Colorado Springs redraws its City Council district boundaries every four years, *see* Colorado Springs City Charter art. II, § 10(b), relying on American Community Survey ("ACS") data during non-census years.  ACS data tends to undercount Hispanic populations.  Undercounting harms Hispanic communities' ability to receive fair representation.  ACS data also lacks the precision needed to provide reliable estimates of population at the municipal level; its use in Colorado Springs' redistricting could conflict with equal population requirements.

**Overall Voting Burden**

55.     While Colorado Springs' April off-year municipal elections have a disparate racial impact, this unusual election timing makes it more difficult for voters of all races and ethnicities to participate in the political process.  Overall turnout in the City's 2017, 2019, and 2021 municipal elections was just 33%, 35%, and 25%, respectively.  On the other hand, overall turnout in the November 2016, 2018, and 2020 elections was approximately 85%, 69%, and 82%, respectively.  Overall turnout in these November elections thus soared by 34 to 60 percentage points from the lows of the City's April off-year municipal elections.

56.     Colorado Springs provides several options for *how* to vote in its municipal elections.  Registered voters can cast ballots by mail, prior to Election Day at Voter Service and

Polling Centers, or on Election Day at these Centers.  However, none of these options mitigates the burden of *when* registered voters must vote in the City's municipal elections—in the April of odd-numbered years, at a time when most registered voters pay less attention to politics.

57.     Moreover, Colorado Springs makes it more difficult to vote early in person or on Election Day in its municipal elections.  The City provides significantly fewer Voter Service and Polling Centers and ballot drop boxes in April off-year elections than in November on-year elections.  On average, registered voters therefore live further from these facilities in April off-year elections and must spend more time traveling to and from them.

**Minority Underrepresentation**

58.     The harms of Colorado Springs' unusually timed municipal elections extend beyond their disparate impact on minority voters' participation.  In combination with the rest of the City's electoral system, the oddly timed elections result in stark minority underrepresentation in the City's government.

59.     At present, eight of the nine members of the Colorado Springs City Council (including all three members elected at-large) are white.  Just one member of the City Council is Hispanic; none are Black.  Mayor John Suthers is also white.

60.     Over the last decade, 32 of the 34 successful candidates for City Council or Mayor were white.  Yolanda Avila was the only successful Hispanic candidate, winning a City Council seat in April 2017 and winning reelection in April 2021.  No Black candidates were successful.  Seven other Hispanic candidates ran for City Council or Mayor but lost.  All 12 Black candidates for these positions lost as well.

61.     Minority underrepresentation pervades other levels of Colorado Springs' government, too.  Approximately 84% of the members of appointed boards and commissions are

white.  Most high earners in institutions such as the District Attorney's Office and Colorado

Springs Utilities are white.  In these organizations, white employees are overrepresented in high-

wage positions while minority employees are overrepresented in low-wage positions.

62.     These statistics fail to reflect the diversity of Colorado Springs' population.

Roughly 69% of the City's residents are non-Hispanic white—a significantly smaller share than

their fraction of elected positions, appointed posts, and high-wage government jobs.  Almost

18% of the City's population is Hispanic—a proportion that substantially exceeds Hispanic

representation in the City's government.  At about 7%, 3%, and 1% of the City's population,

respectively, Black, Asian American, and Native American residents are also underrepresented

in the City's government.

### Non-Responsiveness to Minority Interests

63.     The unusual timing of Colorado Springs' municipal elections further contributes

to the City's lack of responsiveness to the needs and interests of minority residents.  On issues of

particular concern to minority communities, the City frequently declines to act or even acts

contrary to the preferences of minority residents.

64.     The issue of police accountability exemplifies Colorado Springs' non-

responsiveness to minority needs and interests.  The City has a longstanding problem with

violence by police officers against minority residents.  For example, on August 3, 2019, two

police officers killed De'Von Bailey, a 19-year-old Black man.  The officers shot Mr. Bailey

four times in the back as he ran away from their questioning.  No criminal charges were filed

against the police officers involved.  The City Council approved a $2.97 million payout to settle

a civil suit brought by Mr. Bailey's estate alleging racial bias and the use of excessive force.

65.     The Colorado Springs Police Department ("CSPD") accounted for one-tenth of all officer-involved shootings in Colorado from 2016 to 2019.

66.     In June 2020, CSPD Sergeant Keith Wrede commented "KILL THEM ALL" and "KILL EM ALL" in response to a livestream of Black Lives Matter protests.  Sergeant Wrede and another CSPD officer have been sued, along with the City, for using excessive force against and unlawfully arresting Celia Palmer, a Black protestor.  Wrede remains a CSPD sergeant.

67.     The CSPD has also been accused of racial profiling.  In 2020, the ACLU of Colorado sued Colorado Springs, alleging that three CSPD officers engaged in racial profiling when they detained without cause Corey Barnes, a Black resident of the City.  The suit stated that the officers racially targeted Barnes when they restrained and searched him without justification, in violation of the Fourth and Fourteenth Amendments.  Colorado Springs settled the case, paying $65,000.

68.     Against this backdrop, a coalition of local organizations promoting the interests of the Hispanic and Black communities recently called for Colorado Springs to reject a request for increased police funding.  Mayor Suthers dismissed the groups' concerns and instead advanced his budget proposal that included funding for 17 additional police officers, the final batch in a budget increase that has led to the hiring of 120 new officers.

69.     Mayor Suthers did not acknowledge the concerns of the minority communities.  "Our city supports CSPD," he said.  "We are not other large cities from across the country where their communities don't support them . . . .  The larger part of our community supports CSPD."  Evan Ochsner, *CSPD Plans Major Recruitment Effort as its Budget Increases Again*, Colo. Gazette (Oct. 29, 2021).

70.     The City Council similarly fails to respond to the public health concerns of Black and Hispanic communities.  The City Council exacerbates its non-responsiveness by silencing the voices speaking for minority interests.

71.     For instance, the City Council voted to remove Councilmember Avila from the El Paso County Board of Health.  She had been the only woman of color on the Board.

72.     Councilmember Avila, an advocate against racial health disparities, represents City Council District Four, a majority non-white district encompassing southeast Colorado Springs.  Her replacement on the Board, Councilmember Dave Donelson, is a white man representing City Council District One, a majority white district.  When appointed, he "could not yet say what his priorities would be on the [B]oard."  Mary Shinn, *Colorado Springs Councilwoman Says Likely Ouster from Board Suppresses Representation of Southeast District*, Colo. Gazette (May 26, 2021).

73.     Councilmember Avila views her removal as a means to silence minority interests: "It is telling my district, 'even though you guys experience the social determinants of health; even through you guys live sixteen years less; even though you live in a place that's six-to-eight degrees hotter; even though you are in food swamps and food deserts; even though you don't have a hospital down there—we're not going to put your representative to sit on the El Paso County Board of Health.'  It's another way to suppress my voice and the voice of my district." *Id.*

74.     The school boards in Colorado Springs also fail to respond appropriately to the educational concerns of minority communities.

75.     For example, in June 2021 the American Institutes for Research released an Equity Audit Report commissioned by Colorado Springs School District 11 Director of Equity and Inclusion Alexis Knox-Miller.

76.     This report found that District 11, the City's principal school district, has racial performance gaps between and within schools.  The schools that enroll mostly minority students and the schools within the southeast quadrant of the district consistently underperform compared to other schools.

77.     In response to these findings, the Department hosted "equity cafes."  At these events, community members reported feeling prevented from asking questions about the report.

78.     Director Knox-Miller also created a Diversity and Equity Leadership Team but dissolved it in response to the election of three new school board members who had campaigned against the Equity and Inclusion Department.

79.     This dissolution occurred despite concerns that roughly $80,000 of funding for equity-based STEM initiatives would be jeopardized because the funder was worried that the equity-based focus would not be maintained.

80.     Two school board members in District 11 have recently garnered attention for comments and social media posts that community members saw as racist.  In emails sent to other school board members and to Superintendent Michael Thomas, School Board member Al Loma said that he would like to "gangster slap" a Black man that spoke at a board meeting and referred to a local advocacy group consisting of mostly Black men as "barking Chihuahuas."

81.     Students and community members, including the advocacy group Neighbors for Education, have called for the resignation of Loma and of Board Vice President Jason Jorgenson, who posted other derogatory messages.  Neither has resigned.

82.     In March 2022, Colorado Springs School District 11 announced the departure of Superintendent Dr. Michael Thomas.  Dr. Thomas had a stated commitment to equity and closing achievement gaps within the District.

83.     After three new Board members were elected following campaigns in which they expressed opposition to equity initiatives, community members expressed concern that Dr. Thomas would be ousted.

84.     It appears that these community members concerns were well founded.  Although the Board President suggested Dr. Thomas had prompted the departure, Dr. Thomas indicated that he had not wanted to resign and was forced out.  The decision was made after a closed Board meeting with legal counsel to discuss the District's contractual obligations to Dr. Thomas.

85.     The City Council has also failed to respond to rampant housing code violations in the southeast region of the City, the area with the greatest concentration of people of color.  For example, tenants at Terry Ragan's complexes in the Southeast had long complained about cockroaches, mold, leaks, and maintenance issues in their units.  As of 2017, Ragan's complexes—all but one of which were in the Southeast—accounted for around 80% of all housing code violations in the City.

86.     The City has failed to address these growing complaints.  In 2009, it cut code enforcement staff by 20%.  The same year, the City Council rejected a proposed law that would have required landlords to register their properties with the City and complete a rental certification program that included training on minimum housing standards.  From 2003 to 2018, the City Council did not increase fines for repeat offenses or alter the definition of "repeat offense."

87.     The City Council's zoning policies have also contributed to the lack of affordable housing in the City.  Over 80% of residential land in Colorado Springs is zoned for single-family use, which has limited new housing developments.

88.     In 2021, the City Council considered proposed flexible zoning regulations that would allow for higher density housing in existing neighborhoods.  Housing advocates had pushed for measures that would increase the variety of housing types in the City.

89.     The City Council voted down the higher density housing proposal, deciding to maintain single-family use zoning in existing neighborhoods and only utilize flexible zoning in undeveloped parts of the City.

90.     The City Council has also passed measures that create hardships for homeless residents, a disproportionately non-white population.

91.     In 2018, the City Council banned camps within 100 feet of waterways and concrete canals.  The penalties include up to $2,500 in fines and 180 days in jail.  Before issuing summons, the police are not required to ensure that there are empty shelter beds to accommodate violators.  Later that year, the Council passed another ordinance banning RVs from parking on any street in the City.

92.     The City Council's non-responsiveness to minority interests goes beyond these issues.  The City Council often ignores the needs of non-white residents when making routine funding decisions that affect all aspects of life.

93.     The City Council consistently disregards southeast Colorado Springs' need for urban renewal funding.  The City Council authorizes financial assistance for urban renewal projects on "blighted" parcels through the Colorado Springs Urban Renewal Authority ("CSURA").  The City Council established CSURA in 1970; since then, there have only been

two completed CSURA projects in southeast Colorado Springs. Only one of the 13 current projects is in the Southeast's City Council District Four. Each of the other 12 projects is in a predominantly white area.

94.    Recently, the City Council has approved urban renewal funds for newly annexed, vacant land parcels instead of neglected urban areas. These new annexations further draw resources away from minority communities that have waited for years for urban renewal funding.

95.    For example, the City Council approved the annexation of 183 untouched acres into District Two, a majority white district. This area received urban renewal funding for development of a new Air Force Academy visitors center. The City Council ignored protests that the empty site should not receive funds intended for urban redevelopment, especially when minority communities are in need.

96.    Even when the Southeast does receive funds from the City, planned projects do not always come to fruition. For example, the City allocated $2 million to create a turn lane into a vacant Sam's Club lot on South Academy Boulevard in the Southeast to attract new business to the property. However, before breaking ground, the City decided to instead use the funds to help pay for the downtown Cimarron Street/Interstate 25 interchange project.

97.    Other projects in the Southeast, such as a $2.5 million plan to improve an access point south of Hancock Expressway and to build sidewalks, have taken years to get underway.

98.    The City Council also underfunds events focused on minority communities. The City Council chooses how to distribute funding from the Lodgers and Automobile Rental Tax ("LART") revenues, which are intended to finance tourism and community-based events. The council approved about $1.3 million in LART funding for 2022 events and tourist attractions.

Only $10,000 of that $1.3 million went to a multicultural event—only one out of the forty events sponsored.

99.     The only multicultural event to receive funding was Fiestas Patrias, a downtown street festival celebrating Hispanic culture.  The festival received only a quarter of the funds it had requested, with the diminished amount likely sufficient only to cover police support and street barricades, thus being returned to the City itself.

100.     In contrast, the 4th of July Symphony on Your Porch event received about $150,000—entirely meeting funding requests.  Last year, Symphony on Your Porch did not set up a single location in southeast Colorado Springs.

### Historical and Ongoing Discrimination

101.     Colorado Springs' unusually timed municipal elections interact with the City's long and continuing history of racial discrimination to lead to racial disparities in political participation and representation.

102.     In September 1865, the Colorado Constitution was ratified in an election that excluded Black voters.  On the same date, voters approved a measure explicitly prohibiting Black suffrage.  Until it became a State in 1876, at which point it became subject to the Fifteenth Amendment, Colorado barred Black citizens from voting.

103.     Even after they gained the franchise, minority citizens in Colorado Springs were excluded from the political process through discriminatory voting schemes and threats of violence.  From 1922 to the 1970s, the City limited voting on bond issues to residents who paid property taxes.  This policy amounted to a poll tax that disproportionately burdened minority citizens, who were less likely to own property.  This de facto poll tax was not invalidated until 1970, when the Colorado Supreme Court ruled that restricting the franchise to taxpayers is

unconstitutional.  The policy remained on the books in Colorado Springs until 1977, when the City's charter was finally amended.

104.    El Paso County, in which Colorado Springs is located, was covered by Section 5 of the Voting Rights Act from 1975 until 1984 because of electoral practices that excluded Spanish-speaking citizens.  When the County tried to bail out from coverage in the 1970s, the Department of Justice opposed its effort, and the County abandoned its lawsuit.

105.    In the early 20th century, minority citizens throughout Colorado faced the possibility of violence at the hands of the Ku Klux Klan if they tried to participate in the political process.  The Klan heavily influenced Colorado politics in this period.  Colorado had the second-highest Klan membership per capita in the United States.  One of Colorado's governors, Clarence Joseph Morley, was a member of the Klan, and one of Colorado U.S. senators, Rice William Means, was the directing head of the Klan in Colorado.

106.    The threat of violence against minority communities continues.  In 2015, a bomb detonated outside the Colorado Springs office of the National Association for the Advancement of Colored People, causing structural damage.

107.    Even today, Colorado Springs' state and federal representatives sometimes support political violence against their opponents or downplay the needs of minorities in their community.

108.    In recent months, Colorado Springs' state House representative David Williams introduced an amendment to "thank" the "millions of . . . Americans," who stormed the Capitol on January 6, 2021, the first time in American history that the Confederate flag was waved in the U.S. Capitol—a group that included individuals expressly advancing white supremacist ideas and carrying or wearing racist symbols.

109.    Meanwhile, U.S. Representative Doug Lamborn publicly dismissed minorities in Colorado Springs as "gullible" for their concerns over voter suppression efforts.

110.    Minority voters in Colorado Springs have been targeted by door-to-door voter intimidation.  Agents of the so-called United States Election Integrity Plan ("USEIP"), a group that contends that the 2020 election was fraudulent, threatened to come and did come to voters' homes to harass them by alleging that they committed voter fraud and to intimidate them from voting by mail in the future.  In response to this intimidation, several organizations filed suit in this Court, alleging violations of Section 11(b) of the Voting Rights Act and the Ku Klux Klan Act.

111.    These intimidating USEIP agents identified themselves as members of official-sounding organizations, such as the "Voter Integrity Committee," demanded that minority residents confirm their addresses, and questioned them about their participation in the 2020 election and the methods by which they voted.  In some instances, the USEIP members introduced themselves in ways that implied they worked for government agencies when they went to minority voters' homes, accusing voters of casting fraudulent ballots and threatening voters with criminal charges and reprisals.

112.    The complaint recently filed in this Court alleges that USEIP members took photographs of the minority voters, and maintained databases containing information about these residents, their homes, and their vehicles.

113.    USEIP agents carried weapons when they went to voters' homes.  During its canvassing events, USEIP has encouraged gun-carrying members to accompany unarmed ones and to offer their contact information to unarmed agents.  USEIP members regularly offer advice on effective weapons and where to purchase them on the USEIP chatroom.  USEIP encourages

its agents to carry weapons and has told its membership that it will try to establish security for its door-to-door voter intimidation.

114.    Beyond voting, Colorado Springs' minority residents have long suffered from, and continue to endure, discrimination in income, housing, and education.

115.    Compared to Colorado Springs' white residents, the City's minority residents have a lower median household income and a higher poverty rate.  For example, as of the 2019 ACS, the median household income for white households in Colorado Springs is over $69,000, and the median household income for Hispanic and Black households is roughly $20,000 less, approximately $50,000 for Hispanic households and $49,000 for Black households.

116.    Similarly, the poverty rate for Hispanic and Black residents is more than double that of white residents, with a white rate of 8.9% and Hispanic and Black rates of 19.4% and 18.6%, respectively.  Hispanic and Black households are more likely than white households to have annual incomes below $25,000.  And Hispanic and Black residents are more likely than white residents to be unemployed.

117.    Colorado Springs historically segregated its minority residents through redlining and discriminatory zoning rules for low-income areas.  Racially restrictive covenants barring minority residents from purchasing property were also pervasive in the early 20th century.  More recently, the City razed a predominantly Hispanic community in the 1990s and early 2000s to build a park.  Today, racial discrimination remains the second most common basis for fair housing complaints in El Paso County.

118.    This record of housing discrimination has contributed to significant housing disparities between Colorado Springs' minority residents and white residents.  Hispanic and Black residents are less likely than white residents to own homes, and even less likely to be able

to afford them.  According to the 2019 ACS, 63.8% of white households in the City own their home, compared to 45.8% of Hispanic households and 38.8% of Black households.  Hispanic and Black residents are also more likely to be denied home loans without the lender offering a legally-required reason for denial.

119.    As of 2012, there were 22 areas of minority concentration in the City, where a "concentration area" is defined as a "census tract where the percentage of a specific racial or ethnic minority group is double or more than the City's overall average."  These areas were located primarily in the southern part of the City and were more likely to contain households living in poverty.  Additionally, as of 2016, there remained a Racially or Ethnically Concentrated Area of Poverty of Hispanic residents in the City.  El Paso County itself indicated that "there is little doubt that the lack of affordable housing and lack of quality transportation contributes to" the concentration of Hispanic residents in poverty.  El Paso County, Colo., Assessment of Fair Housing Plan (Oct. 4, 2016), *available at* https://cdn.ymaws.com/www.nacced.org/resource/ resmgr/Resource_Library_Files/El_Paso_County_AFH_2017-2021.pdf.

120.    Disparities in educational opportunities further burden Colorado Springs' minority residents.  Minority students are half as likely as white students to be enrolled in Advanced Placement courses.  Minority students are less likely to graduate in four years and more likely to drop out of school.  Minority students are more likely to be subject to disciplinary action, such as out of school suspension, and more likely to be referred to the police for arrest.

121.    In Colorado Springs School District 11, student achievement is unequal both within and between schools.  Schools within this district that enroll mostly racial minority students and schools in the southeast quadrant of the district continually underperform compared to other schools.

122.    Despite evidence of these performance gaps, District 11 disbanded its Diversity and Equity Leadership Team.

123.    In Harrison District 2, where over three-fourths of students are racial or ethnic minorities, only 14% of students achieved math proficiency in 2021.  Even with the widespread fall in academic performance due to the pandemic, achievement in Harrison fell the most.  Harrison had some of the lowest composite scores in the Pikes Peak region.

124.    Residents in the southeast quadrant of Colorado Springs have limited access to quality medical care.  Colorado Department of Public Health and Environment surveys from 2012 to 2015 found that residents in the Southeast, a disproportionately non-white area, must drive further to get medical help than residents in other areas.  There are no hospitals and only a few urgent care clinics in the Southeast.

125.    The absence of hospitals and other facilities is not due to lack of funds in the City.  About 90% of the almost $1 billion in planned hospital construction projects are for those that would require driving over five miles for the *nearest* residents of the Southeast.

126.    As of 2017, one in seven residents of southeast Colorado Springs suffers from frequent mental health issues, and one in six residents delays medical care because they cannot afford it.

127.    The southeast region of Colorado Springs also has limited access to public transportation.  Without public transportation, Southeast residents have limited access to employment opportunities, food, and healthcare.

128.    In 2010, the City decreased its bus service by nearly 50% amid recessionary cuts.  The City cut the public transit budget from $11.9 million in 2008 to $3.1 million in 2011.

Though the City has increased its transit budget over the years, bus service was still down 10% from 2008 levels as of 2018.

129.     During a public hearing on the City's proposed 2016 budget, advocates highlighted the lack of weekend bus service.  They also noted that there were no bus lines that went from the Southeast to the northeastern parts of the City, where the UCHealth Memorial Hospital expansion and Children's Hospital Colorado were being built.

130.     The southeast part of the City is particularly isolated from public transit.  The region is considered a transit desert, with high ratios of unmet transportation need versus supply.

131.     In some Southeast neighborhoods, the only grocery options within a one-mile radius are 7-Eleven stores.

132.     Southeast residents must travel to the Citizens Service Center across the City to receive training and employment assistance from various agencies.  The lack of accessible transportation to these services harms residents' employment prospects.

133.     Additionally, about three-quarters of the roadway in the far southeast area of the City lacks adjacent sidewalks, posing additional hardships for residents who do not drive.

134.     The City increased bus service in the Southeast and added a line to the Northeast only in 2017, after Councilmember Avila pushed for transit budget increases.

135.     Roadway conditions in the Southeast are also more dangerous.  The Southeast experiences a disproportionate number of vehicle crashes compared to the rest of the City.

136.     These conditions interact with and exacerbate the racially disparate impact of Colorado Springs' unusual election timing.

**Lack of Justification**

137.    The unusual timing of Colorado Springs' municipal elections fails to further any legitimate governmental interest.  Instead, this election schedule either has no impact on, or actually frustrates, possible valid objectives.

138.    Colorado Springs does not prevent voter fraud or bolster public confidence in the integrity of elections by holding April off-year municipal elections.  The timing of elections is unrelated to their security or to people's perception of their security.

139.    Colorado Springs does not save any time, money, or work by holding April off-year municipal elections.  To the contrary, the City is forced to organize and administer an additional election every two years.  If the City consolidated its municipal elections with county, state, and federal elections, it could forego this extra organization and administration, and the City would conserve considerable resources.  Coordinating municipal elections with El Paso County alone in odd-year November elections could lead to savings on the scale of 15 to 20% and allow the City to benefit from the $0.80 per ballot subsidy the state provides whenever a state question or candidate appears on the ballot.

140.    Nor does the unusual timing of Colorado Springs' municipal elections make the City's elected officials more accountable for their records in office.  In fact, local officeholders are less accountable for their records when they are selected in off-cycle elections.  In off-cycle elections, local officeholders receive a smaller electoral reward when they have performed well and a smaller electoral penalty when they have performed poorly.  This diminished accountability is attributable to the low turnout that characterizes off-cycle elections.  *See, e.g.*, Julia A. Payson, *When Are Local Incumbents Held Accountable for Government Performance? Evidence from U.S. School Districts*, 42 Legis. Stud. Q. 421 (2017).

141.    Likewise, the low turnout that pervades off-cycle elections causes local officeholders to represent their constituents' views less accurately.  Local governments selected in off-cycle elections embrace policies that are less congruent with voters' preferences.  Local candidates running in off-cycle elections are also more likely to defy public opinion.  *See, e.g.*, Michael T. Hartney & Sam D. Hayes, *Off-Cycle and Out of Sync: How Election Timing Influences Political Representation*, 21 St. Pol. & Pol'y Q. 335 (2021).  Accordingly, the unusual timing of Colorado Springs' municipal elections makes the City's officeholders less, not more, responsive to voters' views.

142.    Nor do off-cycle elections prevent local issues from being overshadowed by national concerns.  In fact, there tends to be at least equal, if not more, media reporting on local issues when municipal elections are held at the same time as statewide and federal elections.

## CLAIM: VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT, 52 U.S.C. § 10301; 42 U.S.C. § 1983

143.    Section 2 of the Voting Rights Act provides that no electoral "standard, practice, or procedure shall be imposed or applied . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).  A violation of Section 2 "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a [racial or ethnic minority] in that its members have less opportunity than other members of the electorate to participate in the political process." *Id.* § 10301(b).

144.    In the context of voting restrictions, courts use a two-part framework to determine when Section 2 is violated.  First, the challenged policy must cause a disparate racial impact on minority members.  Second, that racial disparity must be linked to social and historical

conditions of discrimination.  *See, e.g.*, *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366,

379 (9th Cir. 2016) (en banc); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016) (en banc);

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014).

145.    The timing of Colorado Springs' municipal elections disparately harms the City's

Hispanic and Black residents.  In these April off-year elections, non-white registered voters are

only about *half* as likely as white registered voters to vote.  Moreover, the election schedule leads

to this enormous racial disparity.  In November on-year elections, the ratio of non-white turnout

to white turnout increases by up to almost 40 percentage points.  Consequently, because of the

timing of the City's municipal elections, the City's "political processes . . . are not equally open

to participation" by Hispanic and Black voters, in that these individuals "have less opportunity

than other members of the electorate to participate in the political process."  52 U.S.C.

§ 10301(b).

146.    The April off-year timing of Colorado Springs' municipal elections also interacts

with social and historical conditions of discrimination to lead to this disparate impact.  These

conditions include voting restrictions struck down as unconstitutional, coverage under Section 5

of the Voting Rights Act, and voter intimidation.  The City's history of discrimination manifests

itself today in large racial disparities in income, housing, and education, as well as non-

responsiveness to minority concerns about police violence, public health, educational quality,

housing conditions, and public funding decisions.  This discriminatory legacy is inseparably

linked to the racial disparity caused by the City's election schedule.

147.    Under the "totality of circumstances," *id.*, additional relevant factors may include

the jurisdiction's use of at-large elections and majority vote requirements, the extent to which

minority candidates have won elections in the jurisdiction, the degree to which elected officials

are unresponsive to the concerns of the minority group, the size of any disparate impact caused by a challenged practice, the burden on voting imposed by the practice, whether other policies mitigate or exacerbate the practice's burden, the practice's historical and current prevalence, and the degree to which the practice serves important state interests. *See Gingles*, 478 U.S. at 37; *Brnovich*, 141 S. Ct. at 2338-40.

148.    These considerations further confirm the unlawfulness of Colorado Springs' choice to hold April off-year municipal elections. Colorado Springs continues to have a majority vote requirement for the election of the Mayor, and in addition to the Mayor, three city council seats are elected at large.

149.    Hispanic and Black candidates are consistently unlikely to win elections in Colorado Springs. Over the last decade, more than 90% of the successful candidates for City Council and Mayor were white. Not a single Hispanic or Black candidate prevailed in an at-large election for City Council. There is a single Hispanic member of the City Council; no members are Black.

150.    Colorado Springs is unresponsive to the needs and interests of Hispanic and Black residents. Concerns about police violence, public health, education, housing, and city funding decisions have been pervasively ignored.

151.    The racial disparity caused by the timing of Colorado Springs' municipal elections is massive, dwarfing the disparate impacts typically seen in Section 2 cases.

152.    The overall voting burden imposed by the timing of Colorado Springs' municipal elections is also severe. Turnout in these April off-year elections plummets by 30 to 60 percentage points from the levels of November on-year elections. The timing of the City's

municipal elections therefore "block[s] or seriously hinder[s] voting" for huge swathes of the electorate. *Brnovich*, 141 S. Ct. at 2338.

153.    Nor is this burden mitigated by any other "opportunities provided by" Colorado Springs' "entire system of voting." *Id.* at 2339.  The City offers a number of options for *how* to vote in municipal elections—but none at all that alter the April off-cycle timing.  Moreover, several of the City's other electoral practices exacerbate the impact on Hispanic and Black voters.  The City relies on at-large elections for several positions, requires a majority vote for mayoral elections, and bars candidates from declaring their party affiliations.  The City also makes available fewer voting Voter Service and Polling Centers and ballot drop boxes for its April municipal elections.

154.    Colorado Springs' April off-year municipal elections are, and historically have been, unusual, too.  At present, of the 25 largest jurisdictions, just two others hold April off-year elections.  In the 1980s, it was just three others.

155.    Lastly, far from advancing any important state interest, Colorado Springs' April off-year municipal elections undermine the City's valid objectives.  These elections cost the City additional time, money, and work.  These elections cause the City's elected officials to be less accountable to, and less representative of, their constituents.  And these elections do nothing to fight voter fraud or bolster electoral integrity.  Accordingly, this election timing is not "supported by strong state interests." *Id.* at 2340.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.      Declare that the timing of Colorado Springs' April off-year municipal elections violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

B.      Permanently enjoin Colorado Springs from holding future non-November municipal elections;

C.      Retain jurisdiction to render any and all further orders that this Court may deem necessary;

D.      Award Plaintiffs their attorneys' fees in this action;

E.      Award Plaintiffs their costs of suit; and

F.      Grant any and all other relief this Court deems just and proper.


 Dated: June 1, 2022                              Respectfully submitted,

                                                 */s/ Theresa J. Lee*_____
                                                 Theresa J. Lee
                                                 Daniel Hessel*
                                                 Nicholas Stephanopoulos
                                                 ELECTION LAW CLINIC
                                                 HARVARD LAW SCHOOL
                                                 6 Everett Street, Suite 4105
                                                 Cambridge, MA 02138
                                                 (617) 496-0370
                                                 thlee@law.harvard.edu
                                                 dhessel@law.harvard.edu
                                                 nstephanopoulos@law.harvard.edu

                                                 *Attorneys for Plaintiffs*

                                                 * *federal practice only*