# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:22-cv-01365-CNS-MDB

CITIZENS PROJECT, COLORADO LATINOS VOTE, LEAGUE OF WOMEN VOTERS OF PIKES PEAK REGION, and BLACK/LATINO LEADERSHIP COALITION,

      Plaintiffs,

v.

CITY OF COLORADO SPRINGS, AND SARAH BALL JOHNSON, IN HER OFFICIAL CAPACITY AS CITY CLERK,

      Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

BAKER & HOSTETLER LLP

Richard B. Raile
rraile@bakerlaw.com
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5403
202.861.1500 / Fax 202.861.1783

Patrick T. Lewis
plewis@bakerlaw.com
127 Public Square, Suite 2000
Cleveland, OH  44114-1214
216.621.0200/ Fax 216.696.0740

OFFICE OF THE CITY ATTORNEY
Wynetta P. Massey, City Attorney

W. Erik Lamphere, Division Chief
Erik.Lamphere@coloradosprings.gov
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
(719) 385-5909 / Fax (719) 385-5535

*Counsel for Defendants*

## TABLE OF CONTENTS

Introduction .................................................................................................................1

Statement of Undisputed Material Facts .....................................................................2

A.   Colorado Springs Has Conducted Spring Municipal Elections Since Its Founding
     With No Objection From The Voting Public .........................................................2

B.   The Harvard Election Law Clinic Orchestrates This Test Case Without Voter
     Participation .........................................................................................................3

C.   Plaintiffs Sponsor A Slate Of Experts With Virtually No Local Knowledge And
     Propose A § 2 Theory Of Election "Salience" Based On Turnout .......................5

Legal Standard ............................................................................................................6

Argument ....................................................................................................................7

I.    Plaintiffs Lack Statutory Standing To Prosecute A Section 2 Claim .................7

II.   Plaintiffs' Theory Of Election Salience Is Not Cognizable Under The VRA .................11

Conclusion .................................................................................................................20

Certificate of Service .................................................................................................22

## INTRODUCTION

This is a test case attempting to transform Voting Rights Act ("VRA") § 2 into a national election-day statute. Since its founding in the 1870s, Colorado Springs has conducted its regular municipal elections in the spring, separately from federal elections. Denver maintains a similar election schedule, as do many cities, from Boston to Chicago to Dallas. In June 2022, four non-profit corporate entities that engage in voter outreach (collectively, "Plaintiffs") sued Colorado Springs (the "City") and its chief elections administrator (collectively, "Defendants") contending that only elections conducted on the first Tuesday after the first Monday in November of even-numbered years satisfy § 2. Plaintiffs did not seek to change the City's election timing through democratic means, no Black or Hispanic resident of the City joined this lawsuit, and the City's Black mayor opposes it.

The case is ripe for summary judgment, and Defendants respectfully move this Court for the same under Federal Rule of Civil Procedure 56. The VRA does not authorize corporate entities to enforce § 2's equal-opportunity guarantee, and Plaintiffs' allegation that different election timing would serve their strategic and financial aims falls outside any § 2 right or remedy. On the merits, Plaintiffs cannot show that there is unequal minority opportunity to participate in City elections. Instead, Plaintiffs proffer a theory of election "salience," which proposes that holding elections attracting less public interest (like city elections) at the same time as high-interest elections (like presidential elections) will increase minority participation in the lower-interest elections. Even if evidence supported that position, it is nothing but a policy argument and is not a viable § 2 claim. The right forum for Plaintiffs' assertions is the City's democratic processes, not this Court. The motion should be granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.** **Colorado Springs Has Conducted Spring Municipal Elections Since Its Founding With No Objection From The Voting Public**

1.      Colorado Springs is a chartered home-rule municipality in El Paso County, with a population of about 480,000. Complaint ("Compl."), ECF No. 1, ¶ 31. The 2020 census records that 70% of the voting-age population is white, 5% is Black, and 15% is Hispanic of any race. Ex. A, Michael Barber Feb. 2023 Report ("Barber Opening Rep.") 28, Tbl. 4.

2.      Colorado Springs was founded in 1871 and began conducting April elections at least as early as 1873 and 1874. Ex. B, Matthew Mayberry Feb. 2023 Report ("Mayberry Opening Rep.") 9–10. There is no evidence that the City has ever conducted municipal elections in November. Ex. C, Tom Romero Deposition ("Romero Dep.") 271:25–272:6. Colorado Springs currently conducts its regular municipal elections on the first Tuesday in April of odd-numbered years, and if no mayoral candidate obtains more than 50% of the vote, a run-off occurs in May. Colorado Springs City Charter §§ 2-10(a)(1), 11-20.[1]

3.      In the 1980s, the vast majority of cities held their local elections separately from federal elections, the vast majority still do today, and this includes cities as prominent as Denver, New York, Chicago, Portland, and Boston. Barber Opening Rep. 5–11.

4.      There is no evidence or allegation that the City adopted or maintained any election regulations with the intent to suppress the voting opportunity of any person on account of race, color, or language-minority status. Ex. D, Julia Payson Deposition ("Payson Dep.") 243:6–14; *see also* Romero Dep. 272:3–6.

---

[1] The City's charter is a proper subject of judicial notice. *See Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyoming*, 889 F.3d 1189, 1196 n. 9 (10th Cir. 2018).

5.      There is no evidence of meaningful effort by any constituency within the City to change the City's election timing by democratic means. The City's Black mayor attests that he is "unaware of any grassroots effort in the Black and Hispanic communities to change the timing of Colorado Springs elections." Ex. E, Affidavit of Blessing A. Mobolade ("Mobolade Aff.") ¶ 9. The only evidence of community concern with election timing consists of meetings and initial outreach by non-profit organizations in early 2014. Ex. F, League of Women Voters Deposition ("LWV-PPR Dep.") 166:20–167:6; Ex. G, Citizens Project Deposition ("CP Dep.") 196:25–197:25. But "no consensus" emerged, CP Dep. 198:1–10, 198:22–199:4, and no specific legislation or proposals followed, *id.* at 196:25–197:8, 199:10–21; LWV-PPR Dep. 167:4–9.

6.      Plaintiffs, Citizens Project, Black/Latino Leadership Coalition ("BLLC"), Colorado Latinos Vote ("CLV"), and League of Women Voters–Pikes Peak Region ("LWV-PPR") are non-profit organizations that operate in the Colorado Springs region. Compl. ¶¶ 11–30. Their activities include get-out-the-vote and voter-participation efforts. *Id.* Plaintiffs are not aware of—and have not been involved in—any organized effort to change the timing of municipal elections by democratic means. CP Dep. 199:11–200:10; Ex. H, Black/Latino Leadership Coalition Deposition ("BLLC Dep.") 98:8–11; 123:24–124:5; LWV-PPR Dep. 155:6–11; Ex. I, Colorado Latinos Vote Deposition ("CLV Dep.") 97:8–99:16.

### B.    The Harvard Election Law Clinic Orchestrates This Test Case Without Voter Participation

7.      Between late 2021 and early 2022, the Harvard Election Law Clinic contacted three Plaintiffs about bringing a lawsuit to use § 2 as a vehicle to change the timing of Colorado Springs municipal elections, and the final Plaintiff (CLV) was brought into the matter by Plaintiff BLLC. LWV-PPR Dep. 146:10–25; BLLC Dep. 90:8–11; CP Dep. 165:11–166:9; CLV Dep. 88:24–

89:10. Plaintiffs are not paying for their legal representation. LWV-PPR Dep. 147:6–9; CP Dep. 176:15–19; CLV Dep. 91:17–20.

8.      Plaintiffs filed this action on June 1, 2022, against the City and the City Clerk in her official capacity, asserting one cause of action under the § 2 "effects" test, claiming the City's spring municipal elections discriminate against Black and Hispanic voters. *See* Compl. ¶¶ 143–55. Plaintiffs ask the Court to "[p]ermanently enjoin Colorado Springs from holding future non-November municipal elections." *Id.* at 38 (Prayer for Relief (B)).

9.      No voters joined this suit, *see* Compl. at 1, and Plaintiffs do not sue on behalf of individual members. BLLC Dep. 98:12–17; 101:20–102:25; CP Dep. 202:15–22; CLV Dep. 100:8–101:2; LWV-PPR Dep. 174:4–11. In fact, Plaintiffs have few (or no) members. CP Dep. 15:10–15, 16:25–17:2 (ten board members but no regular members); CLV Dep. 16:22–25 (nine members); BLLC Dep. 19:11–15 ("like 20 members"); LWV-PPR Dep. 23:4–6 (about 135 members). LWV-PPR has the most members of any Plaintiff, and nearly all are white. LWV-PPR Dep. 21:25–22:21.

10.     The City's Black mayor attests that he "oppose[s] this lawsuit." Mobolade Aff. ¶ 11. However, he is willing to consider and work for a change in the election timing, "[i]f a genuine grassroots effort were to arise to change the election date." *Id.* ¶ 12.

11.     Plaintiffs allege injury only to themselves as organizations, contending the City's election timing causes them to duplicate resources for their voter outreach. CP Dep. 88:6–23, 91:23–92:25; LWV-PPR Dep. 167:18–168:2; CLV Dep. 86:14–87:5. They also assert moving municipal elections to November would enable them to fund more activities, CP Dep. 92:12–25; BLLC Dep. 73:18–23, given that (they say) outside organizations are more willing to fund voter

outreach in November of even years than in spring of odd years. CP Dep. 267:15–268:4; BLLC

Dep. 102:20–25, 123:18–23.

> **C.**  **Plaintiffs Sponsor A Slate Of Experts With Virtually No Local Knowledge And Propose A § 2 Theory Of Election "Salience" Based On Turnout**

12.    Plaintiffs disclosed three expert witnesses. Not one can name the current or former

mayor of Colorado Springs. Romero Dep. 215:20–216:5, 217:3–7; Payson Dep. 135:6–7, 211:5–

12; Ex. J, Zoltan Hajnal Deposition ("Hajnal Dep.") 29:19–30:3. None of these experts studies or

even casually follows Colorado Springs elections. *See, e.g.,* Romero Dep. 216:6–11; Payson Dep.

31:2–13, 115:4–6, 129:14–21; Hajnal Dep. 205:17–206:10.

13.    In the spring 2023 municipal elections, a Black, Nigerian immigrant with no prior

experience in elected office, Yemi Mobolade, soundly defeated a prominent white city council

member, Wayne Williams, in the City's mayoral contest. Ex. K, Michael Barber June 2023

Rebuttal Report ("Barber Rebuttal Rep.") 5–7. Even though the parties jointly requested an

extension of the expert-report deadline to "allow experts to review and incorporate data" from the

2023 elections, ECF No. 43 at 2 (¶ 4), which the Court granted, ECF No. 45, Plaintiffs' June 2023

expert reports do not mention Mayor Mobolade's victory.

14.    The summary-judgment record contains no evidence that April odd-year elections

impose an obstacle, or even an inconvenience, to minority participation.

15.    Plaintiffs' principal expert, Dr. Hajnal, attempts to show that minority voters are

"underrepresented" in April odd-year elections as compared to November even-year elections,

such that there is a percentage increase in Black and Hispanic participation in even-year November

elections as compared to odd-year April elections and that this increase is greater than the

percentage increase in white participation in even-year November elections as compared to odd-year April elections. Ex. L, Zoltan Hajnal Feb. 2023 Report ("Hajnal Opening Rep.") 1–3.

16.    The alleged cause of this supposed differential is properly understood by the concepts of "salience" and "concurrence." As Dr. Hajnal explained, November even-year elections feature highly visible elections that generate voter interest. Hajnal Dep. 33:1–18. The political-science term for this is "salience." *Id.* Some elections, such as presidential elections, are more salient than others, such as municipal and school-board elections. *See id.* at 34:18–35:22. Conducting lower-salience elections concurrently with higher-salience elections may leverage comparatively high participation (including by minority voters) in the higher-salience elections to generate increased voting in the lower-salience elections. *E.g.*, *id.* at 204:11–23; 219:1–220:6.

**LEGAL STANDARD**

Summary judgment is required where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The movant's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once that occurs, "the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted).

## ARGUMENT

### I.    Plaintiffs Lack Statutory Standing To Prosecute A Section 2 Claim

Plaintiffs lack a private right of action under § 2. They are not minority voters and do not assert the rights of anyone who is. They instead claim spring elections harm their financial and strategic goals. Those are not VRA injuries, and the VRA does not remedy them.

A.    "Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress . . . to determine in addition, who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241 (1979). Accordingly, courts must "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). "In particular, 'the question is which class of litigants may enforce in court legislatively created rights or obligations.'" *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017) (quoting *Davis*, 442 U.S. at 239).

Those courts that have found a private cause of action under VRA § 2 have located it in § 3, which states that "an aggrieved person" may "institute[] a proceeding." 52 U.S.C. § 10302(a). *See Roberts v. Wamser*, 883 F.2d 617, 621 & n.12 (8th Cir. 1989); *Alabama State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020), *vacated* 141 S. Ct. 2618 (2021); *cf. Morse v. Republican Party of Virginia*, 517 U.S. 186, 233 (1996).[2] An "aggrieved person" is one "suffering from an infringement or denial of legal rights,"

---

[2] One recent decision holds that § 2 contains no private right of action. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 586 F. Supp. 3d 893, 905–24 (E.D. Ark. 2022), *appeal pending* No. 22-1395 (8th Cir.). Nevertheless, without prejudice to arguments it may advance at any later stages of this case, the City here assumes some private plaintiffs may sue to enforce § 2.

*Aggrieved*, Webster's Third New International Dictionary of the English Language, Unabridged (1978), and § 2 forbids the "right . . . to vote" from being infringed on "account of race or color," 52 U.S.C. § 10301(a). Because a "person" in this context must be an "an individual human being," *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 460 (E.D. Tex. 2020) (citation omitted), § 2 can be read to authorize suit only by "voters" alleging "infringement of the right to vote on account of race." *Roberts*, 883 F.2d at 621.

In *Roberts*, the Eighth Circuit rejected a claim by a candidate for office who sought redress for "the loss of the votes that he claims he would have received if not for the allegedly disproportionate difficulties of black voters in coping with" the challenged electoral mechanism. 883 F.2d at 621. Other courts have followed suit. Claims by candidates have failed, *Oh v. Philadelphia Cnty. Bd. of Elections*, No. CIV.A.08-0081, 2008 WL 4787583, at *7 (E.D. Pa. Oct. 31, 2008); *White-Battle v. Democratic Party of Virginia*, 323 F. Supp. 2d 696, 703 (E.D. Va. 2004), *aff'd*, 134 F. App'x 641 (4th Cir. 2005), as have claims by local governments resisting statutes governing their elections, *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1433 (E.D. Ark. 1994); *City of Baker Sch. Bd. v. City of Baker*, No. 06-937-C, 2007 WL 9702694, at *2 (M.D. La. Jan. 12, 2007), as did the claim of a white voter asserting he "votes in lockstep with minority groups in all elections," *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020).

B.    As in *Roberts*, Plaintiffs here do not "claim that [their] right to vote has been infringed because of [their] race." 883 F.2d at 621. Nor could they. Plaintiffs are non-profit corporations that have neither a race nor voting rights. Plaintiffs contend they would benefit financially and strategically if City municipal elections were to moved to November. *See* Statement of Material Undisputed Facts ("SMUF") ¶ 11. But these are no different from the

benefits VRA enforcement might confer on candidates who might receive votes from minorities, white voters who share minority voting preferences, or local governments that object to state laws potentially overridden by the VRA. No Plaintiff is an "aggrieved person" in the relevant sense of suffering abridgement of personal voting rights on account of race or language-minority status.

Plaintiffs apparently intend to rely on the standing doctrine that permits an "organization" to "claim that it suffered an injury in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (*SFFA*); *see* Compl. ¶¶ 13–14, 19–20, 23–24, 30. Even if Plaintiffs have recourse to that doctrine, it satisfies only "the standing requirements of Article III." *SFFA*, 143 S. Ct. at 2157. Plaintiffs' ostensible position ignores the "unlikelihood that Congress meant to allow all factually injured plaintiffs to recover" under § 2. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 (1992); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176 (2011) (rejecting the argument that "the aggrievement referred to" in Title VII of the Civil Rights Act "is nothing more than the minimal Article III standing"). As shown, the term "aggrieved person" embraces "minority voters," *Roberts*, 883 F.2d at 621, not corporate persons who do not and cannot claim denial of the right to vote because of race.

To be sure, an organization might in some cases bring a § 2 claim by asserting "standing solely as the representative of its members," who might be proven to have Article III standing, *SFFA*, 143 S. Ct. at 2157 (citation omitted), and be within the VRA's right of action, *see Roberts*, 883 F.2d at 621. But each Plaintiff expressly denies that it brings this suit for specific individual voters, SUMF ¶ 9, and Plaintiffs do not attempt to meet the requirements of associational standing, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), and likely could not, *see* SUMF ¶ 9.

C.      "[B]ackground principles" that inform the private-right analysis confirm that statutory standing is absent in this case. *See Lexmark*, 572 U.S. at 129.

First, the Supreme Court has directed courts to "presume that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Id.* (citation omitted); *see also Thompson*, 562 U.S. at 176–78 (construing the term "aggrieved" to incorporate a zone-of-interest test). Here, the statute Plaintiffs sue under is named the *Voting* Rights Act, its "purpose . . . is to protect minority voters," *Roberts*, 883 F.2d at 621, and it guarantees "the right of any citizen of the United States to vote," regardless of "race or color," 52 U.S.C. § 10301(a). It "requires no guesswork" to see that corporate entities seeking reduction of operating costs are not within the zone of interests. *Lexmark*, 572 U.S. at 131.

Second, courts must "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Id.* at 132. The standard is not met "if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'" *Id.* at 133 (quoting *Holmes*, 503 U.S. at 268). In this case, Plaintiffs' alleged harms are remote and derivative. They allege the VRA condemns a supposedly adverse effect of spring elections on Black and Hispanic turnout. The supposed impact on Plaintiffs' operating costs is, at most, incidental to that injury to others. *See Holmes*, 503 U.S. at 269–70.

Third, as in other failed attempts to enforce the VRA, this case involves a "possible divergence of interests between" Plaintiffs seeking to reduce their costs and "a citizen attempting to protect his right to vote." *Roberts*, 883 F.2d at 622. There is no evidence that Black and Hispanic voters desire in a change in the election date, and the City's Black mayor—who prevailed over a prominent white candidate in a spring odd-year election—"oppose[s] this lawsuit." Mobolade Aff.

¶ 11. There is no basis for Plaintiffs to claim a VRA injury and remedy derivative of supposed injuries to minority voters, when the City's most prominent minority leader does not support their effort.

## II.    Plaintiffs' Theory Of Election Salience Is Not Cognizable Under The VRA

On the merits, Plaintiffs' § 2 claim fails as a matter of law because it has no "logical bearing on whether voting is 'equally open' and affords equal 'opportunity'" to minority voters. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). Plaintiffs cite no obstacle to voting that might apply unequally to Black and Hispanic voters. Instead, they propose that conducting elections that attract less interest from minority voters concurrently with elections that attract more interest would increase minority participation in the less "salient" elections. While some political scientists may prefer that approach for policy reasons, the theory is not cognizable under § 2.

A.    A § 2 violation is established "if, based on the totality of circumstances, it is shown that the political processes . . . are not equally open to participation by members of" a racial or language-minority group "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The key requirement" of this text is that elections "be 'equally open' to minority and non-minority groups alike," which means "'without restrictions as to who may participate.'" *Brnovich*, 141 S. Ct. at 2337 (citation omitted). Because § 2 equates equal openness with equal "opportunity," it also "may stretch that concept to some degree to include consideration of a person's ability to *use* the means that are equally open." *Id.* at 2338. And, given that § 2 looks to "the totality of the circumstances," "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Id.* at 2338.

In this case, there is no evidence that municipal elections in the City are not equally open. All voters, regardless of race and language-minority status, have the same opportunity as all other voters to vote in spring odd-year elections. "[T]here is an absence of evidence" to the contrary. *Celotex*, 477 U.S. at 325. No witness attests that Hispanic and Black voters are subject to "restrictions" in spring elections that do not apply to white voters or that members of these groups lack an equal chance "to *use* the means that are equally open." *Brnovich*, 141 S. Ct. at 2337–38 (citation omitted). Moreover, while the Supreme Court has held that "[m]ere inconvenience cannot be enough to demonstrate a violation of § 2," *id.* at 2338, Plaintiffs have no evidence that April is an inconvenient time for Hispanic and Black residents to vote.

B.    Plaintiffs instead proffer a theory of election salience. Dr. Hajnal attempts to show that minority voters are "underrepresented" in April odd-year elections as compared to November even-year elections by comparing turnout ratios. *See* SUMF ¶¶ 15–16. Even assuming his Byzantine method of framing turnout patterns said something meaningful about voting participation,[3] it cannot prove that April elections are "unequally open." *Brnovich*, 141 S. Ct. at 2345. It is no secret why turnout patterns of all racial and language groups differ between April odd-year and November even-year races. As Dr. Hajnal explained, November even-year elections feature highly visible federal and state elections—especially, for the presidency—that are more "salient" than municipal elections. SUMF ¶¶ 15–16. Plaintiffs' § 2 contention is that conducting

---

[3] Dr. Hajnal's method stands condemned in precedent because he creates "a distorted picture" of turnout patterns "by dividing one percentage by another." *Brnovich*, 141 S. Ct. at 2345; *see* Hajnal Dep. 99:20–100:2 (explaining method of dividing percentages). Even assuming the accuracy of Dr. Hajnal's problematic means of estimating minority turnout patterns, *but see* Barber Opening Rep. 15–20, the proper method of subtraction shows there is no turnout disparity, *id.* at 21–30. But the Court need not adjudicate these issues now to see that Plaintiffs do not prove inequality.

lower-salience elections concurrent with higher-salience elections may leverage comparatively high minority participation in the higher-salience elections to increase minority voting in the lower-salience elections. *E.g.,* Hajnal Dep. 204:11–23; 219:1–220:6. An evolving body of political-science research examines the effects of concurrent and non-concurrent elections, and many political scientists believe there would be benefits to holding all elections concurrent on one election day. *See* Ex. M, Sarah Anzia June 2023 Report ("Anzia Rep.") 6–7.

Plaintiffs are entitled to advocate for that view, but it has no "logical bearing on whether voting is 'equally open' and affords equal 'opportunity.'" *Brnovich*, 141 S. Ct. at 2338. This theory of salience does not depend on (or even hint towards) "restrictions as to who may participate" or an unequal "ability to *use* the means that are equally open." *Id.* at 2337–38. Instead, the theory depends on interest in elections on a ballot on a given day. But "[t]he concepts of 'openness' and 'opportunity' connote the absence of obstacles and burdens that block or seriously hinder voting," so § 2 is not even arguably offended unless there is a "burden" on voting. *Brnovich*, 141 S. Ct. at 2338. In *Brnovich*, the Court considered (and upheld) voting rules that would sometimes invalidate votes of voters who tried to vote but ran afoul of the rules, either by appearing at the wrong polling location or handing a ballot to an unauthorized recipient. *Id.* at 2333–48. The dissenting opinion criticized the majority's approval of "voting practices that make it harder for members of some races than of others to cast a vote," including the challenged rules that "result[] in Hispanic and African American voters' ballots being thrown out at a statistically higher rate than those of whites." *Brnovich*, 141 S. Ct. at 2356, 2366. The dissent feared the decision would permit "forms of identification that [minority] voters were less likely to have," "voting places and times [not] convenient for those voters," or "purg[ing] . . . voter rolls through mechanisms especially likely to

ensnare them." *Id.* at 2354 (Kagan, J., dissenting). But both opinions were clear that § 2 scrutiny is triggered by a "racial disparity in the opportunity to vote." *Id.* at 2357 (Kagan, J., dissenting).

Both opinions likewise rejected the idea that § 2 might obligate jurisdictions to maximize interest in their elections. As Justice Kagan put it: "If members of different races have the same opportunity to vote, but go to the ballot box at different rates, then so be it—that is their preference, and Section 2 has nothing to say." *Id.* at 2358 (Kagan, J., dissenting). As noted, the majority opinion held that § 2 is satisfied by "the absence of obstacles and burdens." *Id.* at 2338. That holding was not new. Courts have long concluded that, "[o]bviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992); *see also Smith v. Brunswick Cnty., Va., Bd. of Sup'rs*, 984 F.2d 1393, 1400–01 (4th Cir. 1993). Just as § 2 does not render "minority voters . . . immune from the obligation to pull, haul, and trade to find common political ground," *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994), it does not require jurisdictions to leverage election salience in setting election timing to boost minority participation.

C.    None of this is to suggest that election timing will always comply with § 2. There may be cases where election timing imposes "obstacles and burdens that block or seriously hinder voting." *Brnovich*, 141 S. Ct. at 2338. For example, a jurisdiction might hold elections at "a time when migrant farmworkers who were registered to vote . . . were away on their yearly migration"; if those "farm workers are virtually all Hispanic," § 2 might require a different election date. *See Garcia v. Guerra*, 744 F.2d 1159, 1161 (5th Cir. 1984); *cf. Salas*, 964 F.2d at 1545. A jurisdiction also would likely offend § 2 by opening polls only for a limited time on election day, if it were shown that minority voters have less ability than white voters to obtain leave from work to vote.

*Cf. Chisom v. Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J., dissenting) (employing similar hypothetical in registration context); *Brnovich*, 141 S. Ct. at 2358–59 (Kagan, J., dissenting) (repeating this hypothetical). Those examples show how election timing might impact "a person's ability to *use* the means" of voting, as the *Brnovich* majority put it, 141 S. Ct. at 2338, or "make it harder for members of some races than of others to cast a vote," as the dissent put it, *id.* at 2356.

But nothing like that is present here. Plaintiffs do not contend that minority voters face scheduling hurdles in spring elections that white voters do not confront. Plaintiffs instead contend that there is only one *right* election date—specifically, the first Tuesday after the first Monday in November—and every other day is wrong. Indeed, the logical result of Plaintiffs' theory is that only that specific date in *even*-numbered years would qualify. Hajnal Opening Rep. 7–8 (identifying minority turnout as "much higher" during November even-year elections and a "four-fold increase" over April); Hajnal Dep. 34:18–35:15 (acknowledging that "November even-year elections that coincide with presidential and statewide elections are higher-salience"). Moreover, there is a turnout differential between presidential and mid-term elections, and only on presidential-election dates is the supposed discriminatory impact truly resolved. Hajnal Opening Rep. 12, Fig. 6. The result of Plaintiffs' theory is that § 2 tolerates only one or two election dates in a four-year period of 1,460 or 1,461 days. The theory, in short, is that § 2 mandates a national election day. That is both wrong and symptomatic of a flawed legal theory.[4]

---

[4] Even if non-concurrent elections could sometimes violate § 2 under a salience theory, Plaintiffs picked the wrong jurisdiction for their test case. Colorado elections have as minimal a voting burden as there is anywhere: all active registered voters receive ballots by mail, Colo. Rev. Stat. § 1-7.5-107(3)(a)(I), *see also Judicial Watch, Inc. v. Griswold,* 554 F. Supp. 3d 1091, 1097 n.3 (D. Colo. 2021), and may return ballots by mail. Colo. Rev. Stat. § 1-7.5-107(4)(b)(II).

D.      Multiple tools of statutory construction confirm that Plaintiffs' reading of § 2 is untenable.

The most important among them is the canon of constitutional avoidance, which commands courts to resolve any doubt in a statute by choosing the interpretation that "avoid[s] serious constitutional concerns." *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (plurality opinion). If Plaintiffs' § 2 theory of election salience were plausible (it is not), it would still fail because "the Constitution gives the States primary authority over the structuring of electoral systems." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 216 (2009). "No function is more essential to the separate and independent existence of the States and their governments than the power to determine . . . the nature of their own machinery for filling local public offices." *Id.* (quoting *Oregon v. Mitchell*, 400 U.S. 112, 125 (opinion of Black, J.)).

According to Plaintiffs, when Congress adopted the § 2 "effects" test in 1982, it imposed a national election day (or set of days) on most or all jurisdictions for most or all elections. That is not constitutionally permissible. Congress lacks authority to set election dates for state and local elections. *See Oregon*, 400 U.S. at 125–26 (opinion of Black, J.). And it cannot plausibly overcome its constitutional constraints by scheduling salient federal elections to drive turnout (including minority turnout), *see id.* at 122–23 (discussing U.S. Const. Art. I, § 4 and Art. II, § 1), and then citing its power to enforce the Fourteenth and Fifteenth Amendments, *see id.* at 126–27, to mandate that non-federal elections be held at times when Congress itself created the conditions of high turnout (including minority turnout). In function, that is what Plaintiffs assert Congress did in § 2. Even if Congress had intended that result—it did not—that choice would be unconstitutional. Plaintiffs' theory fails on that basis alone. *See Nw. Austin*, 557 U.S. at 217–29.

Then there is the doctrine that Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). If Congress intended a national election day, or even to limit most jurisdictions to November elections, then someone should have noticed this in 1982. *See Brnovich*, 141 S. Ct. at 2339 ("We doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States."). Pursuant to our constitutional scheme of local control, cities have always conducted elections at times other than those Congress selected. There is no dispute that as of the mid-1980s, most cities in the United States conducted elections in months other than November, Ex. N, Julia Payson June 2023 Report 2, and even today, most jurisdictions in the United States, and the vast majority of large Colorado cities, do not conduct their elections concurrently with federal elections, Barber Opening Rep. 10. It is implausible that Congress intended to so radically transform the balance of national and local authority over elections by such a circuitous route as a guarantee of "opportunity." 52 U.S.C. § 10301(b).

Plaintiffs' salience theory is unpersuasive for the additional reason that it "would produce an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (citation omitted). There is no limiting principle on Plaintiffs' proposed § 2 obligation to maximize minority interest and participation. In this case, Plaintiffs propose that City elections be concurrent with more "salient" elections. But their theory contains no principled basis for differentiating this form of salience from other possible forms. If a political scientist argued that minority participation would increase if voting were coordinated in space and time with major entertainment events, like athletic contests or concerts, then § 2 as Plaintiffs read it would require this novel form of concurrence. A future plaintiff might also demonstrate that

elections conducted via certain means—such as the internet—enhance minority participation. And, because different offices and candidates attract different levels of attention, Plaintiffs' theory would entitle federal intervention in the functions and powers of government offices and conditions facilitating different types of candidacies. The possibilities are boundless. Indeed, Plaintiffs cannot agree on *which* election day the Court should impose; two prefer November even-year elections, CP Dep. 227:14–21; CLV Dep. 102:12–23, and two prefer November odd-year elections. LWV-PPR Dep. 182:25–183:11; BLLC Dep. 124:9–18.

E.       In their Complaint, Plaintiffs attempted to amplify their salience theory by asserting that the City's election timing "interacts with other features of the City's electoral system to aggravate its impact on minority residents." Compl. ¶ 51. But these "features" also lack a logical connection to equal opportunity, and no evidence supports Plaintiffs' assertions.

First, Plaintiffs complain that the City elects three of nine council members from at-large districts, which they say can dilute minority voting power "[u]nder conditions of racially polarized voting." *Id.* But a plaintiff asserting this theory of "vote dilution," *see Brnovich*, 141 S. Ct. at 2333, cannot establish cognizable harm without first proving that (1) the relevant minority group "is sufficiently large and geographically compact to constitute a majority" in more majority-minority "single-member district[s]" than currently exist, (2) that the minority group is "politically cohesive," and (3) "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citation omitted). In this case, Plaintiffs admitted they have no evidence of any of these "threshold conditions," *id.*; *see* Ex. O, Plaintiffs' Interrogatory Responses at ## 4–6; Hajnal Dep. 49:15–21.

That dooms this line of argument. "Unless these points are established, there neither has been a wrong nor can be a remedy." *Growe*, 507 U.S. at 40–41.

Second, Plaintiffs criticize the City for redistricting its single-member city council districts every four years (rather than once per decade) because (they say) this requires the city to utilizes the American Community Survey ("ACS") to configure equally populated districts, which (they allege) "tends to undercount Hispanic populations." Compl. ¶ 54. But Plaintiffs have no evidence of what data the City uses to redistrict, that the ACS actually undercounts Hispanic populations as compared to the decennial census, or that this undercount impacts redistricting in the City.

And—besides all that—their assertion is incoherent. Section 2 often requires jurisdictions to create majority-Hispanic districts, and, when it does, it demands that the Hispanic population be measured by its citizens (a measure called "CVAP" for "citizen voting-age population"), given the comparatively high level of non-citizens within that group. *See, e.g.*, *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 429 (2006); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999); *Thompson v. Glades Cnty. Bd. of Cnty. Comm'rs*, 493 F.3d 1253, 1263 n.19 (11th Cir. 2007). This information "comes from the American Community Survey[.]" *See, e.g.*, *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 226 (2d Cir. 2021); *Rodriguez v. Harris Cnty., Tex.*, 964 F.Supp.2d 686, 728 (S.D. Tex. 2013) ("The ACS is at present the only reliable source of citizen-voting age population data."). Because ACS data is "routinely relied upon in § 2 cases," Plaintiffs "cannot be heard to complain about [its] accuracy," *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1393 (E.D. Wash. 2014), and courts have found it to contain "the most accurate data," *Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1059 (E.D. Va. 2021), *vacated on other grounds*, 42

F.4th 266 (4th Cir. 2022). To hold otherwise would deny § 2 protection for Hispanic populations across the nation.

Third, Plaintiffs challenge the City's use of non-partisan elections, contending that "[m]inority-preferred candidates often do worse in nonpartisan elections because they are unable to take advantage of party labels that would resonate with many voters." Compl. ¶ 53. But this assertion, too, fails for lack of evidence. To know how "minority-preferred candidates" may fare, Plaintiffs would need evidence about which candidates are preferred by minority voters, and Plaintiffs admit they do not know because they did not conduct a racial-polarization analysis. Hajnal Dep. 49:15–21, 176:23–177:5. There is, then, no evidence of what impact non-partisan elections may have and no basis for the Court to find that unequal opportunity might result from this election feature, which is the national norm. *See* Barber Opening Rep. at 10, Tbl. 1.

Finally, Plaintiffs also have no evidence to support their contention that the majority-vote requirement governing mayoral contests—but not any other municipal contest—creates unequal opportunity. Plaintiffs' experts did not analyze the majority-vote requirement or its impact in Colorado Springs, and on this point, as on all others, there is "an absence of evidence" necessary to create a triable fact question. *Celotex*, 477 U.S. at 325.

## CONCLUSION

The Court should grant the motion and enter summary judgment in favor of Defendants on Plaintiffs' VRA claim.

Dated: July 28, 2023

Respectfully submitted,

BAKER & HOSTETLER LLP

*/s/ Richard B. Raile*
Richard B. Raile
rraile@bakerlaw.com
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5403
202.861.1500 / Fax 202.861.1783

Patrick T. Lewis
plewis@bakerlaw.com
127 Public Square, Suite 2000
Cleveland, OH  44114-1214
216.621.0200/ Fax 216.696.0740

OFFICE OF THE CITY ATTORNEY
Wynnetta P. Massey, City Attorney

W. Erik Lamphere, Division Chief
Tracy M. Lessig, Deputy City Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
(719) 385-5909 / Fax (719) 385-5535
erik.lamphere@coloradosprings.gov
tracy.lessig@coloradosprings.gov

*Counsel for Defendants, City of Colorado
Springs and Sarah Ball Johnson, in her
official capacity as City Clerk*

**CERTIFICATE OF SERVICE**

I certify that on this 28th day of July, 2023, the foregoing was filed on the Court's EM/ECF system. Notice of this filing will be sent to all counsel of record by the Court's system. Copies of this filing can be obtained from the Court's system.

*/s/ Richard B. Raile*
Richard B. Raile
*Counsel for Defendants, City of Colorado Springs and Sarah Ball Johnson, in her official capacity as City Clerk*