**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CITIZENS PROJECT, COLORADO
LATINOS VOTE, LEAGUE OF WOMEN
VOTERS OF THE PIKES PEAK REGION,
and BLACK/LATINO LEADERSHIP
COALITION,

                  Plaintiffs,                         No. 22-cv-1365-CNS-MDB

v.

CITY OF COLORADO SPRINGS, and
SARAH BALL JOHNSON, in her official
capacity as City Clerk,

                  Defendants.

---

## FINAL PRETRIAL ORDER

---

### 1.      DATE AND APPEARANCES

This conference was held December 21, 2023.

Present on behalf of Plaintiffs Citizens Project, Colorado Latinos Vote, League of

Women Voters of the Pikes Peak Region, and Black/Latino Leadership Coalition:

Theresa J. Lee
Daniel Hessel
Election Law Clinic
Harvard Law School
6 Everett Street, Suite 4105
Cambridge, MA 02138
(617) 496-0370
thlee@law.harvard.edu
dhessel@law.harvard.edu

Present on behalf of Defendants City of Colorado Springs and Sarah Ball Johnson:

W. Erik Lamphere
Tracy Lessig

Office of the City Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, CO  80903
(719) 385-5909
Erik.Lamphere@coloradosprings.gov
Tracy.Lessig@coloradosprings.gov

Patrick T. Lewis
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, OH  44114
(216) 621-0200
plewis@bakerlaw.com

## 2.      JURISDICTION

This action arises under the laws of the United States—specifically, Section 2 of

the Voting Rights Act, 52 U.S.C. § 10301. This Court has jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1343(a)(4).

Plaintiffs contend this Court also has jurisdiction under 42 U.S.C. § 1983 and 28

U.S.C. §§ 2201 and 2202.

## 3.      CLAIMS AND DEFENSES

**<u>Plaintiffs:</u>**

Plaintiffs Citizens Project, Colorado Latinos Vote, League of Women Voters of the

Pikes Peak Region, and the Black/Latino Leadership Coalition (collectively, "Plaintiffs")

bring this action for declaratory and injunctive relief under the Voting Rights Act against

Defendants City of Colorado Springs ("City") and Sarah Ball Johnson in her official

capacity as City Clerk (collectively, "Defendants"). Plaintiffs claim that the unusual timing

of the City's municipal elections—held in April of odd-years—violates Section 2 of the

Voting Rights Act, 52 U.S.C. § 10301, by disparately impacting the City's Black and

2

Hispanic residents. Section 2 squarely encompasses a challenge to the City's unusual municipal election timing. *See* S. Rep. No. 97-147 at 153–54 (1982); *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 174 (1985).

In Colorado Springs, the unusual timing of the City's municipal elections causes significant racial disparities in voting that interreact with social and historical conditions of discrimination in the City to amount to unlawful vote denial of the City's Black and Hispanic residents. Because Colorado Springs hosts its municipal elections in April of odd years, its "political processes . . . are not equally open to participation by" Black and Hispanic residents, in that these individuals "have less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b).

To prove a Section 2 violation, Plaintiffs must demonstrate that the challenged policy causes a disparate racial impact on minority community members. Plaintiffs must also prove that the racial disparity is linked to social and historical conditions of discrimination through a totality of the circumstances inquiry. *See, e.g., Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 379 (9th Cir. 2016) (en banc); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016) (en banc); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014). Many of the factors to be considered as part of this analysis are listed in the Senate Report accompanying Section 2. S. Rep. No. 97-147 (1982). In *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), the Supreme Court enumerated additional "important circumstances" that should be considered part of the "totality of circumstances" inquiry in a Section 2 vote denial case. *Id.* at 2338.

As to the first element of this test, Plaintiffs will prove at trial that the City's municipal election timing causes voter turnout among the Black and Hispanic communities to plummet far below white voter turnout in municipal elections. Black and Hispanic turnout in the City's April elections is always less than 20%, while white turnout always exceeds 25% and sometimes approaches 40%. This extremely low turnout for Black and Hispanic voters does not occur during November even-year elections. Computing turnout by race across multiple methodologies confirms this same basic trend: April odd-year elections in Colorado Springs depress turnout among the City's Black and Hispanic voters at a much greater rate than they lower the City's white voter turnout.

Plaintiffs will also prove at trial that the City's history of racial discrimination, the continuing effects of that discrimination on the city's Black and Hispanic communities, the lack of electoral success for members of those communities, and other aspects of the City's electoral system exacerbate the disparate racial impact of the City's municipal election timing. This evidence proves that the racial impact of the City's municipal election timing interacts with social and historical conditions to deny Black and Hispanic residents equal opportunity to participate in the political process.

Myriad evidence shows the totality of circumstances weighs in Plaintiffs' favor. Historical experts on both sides of this litigation have identified a history of public and private discrimination in Colorado Springs, and to this day, Black and Hispanic residents trail white residents on all socioeconomic factors. Black and Hispanic candidates have also fared far worse in Colorado Springs elections than white candidates. Unsurprisingly then, the evidence Plaintiffs will present at trial also shows that the City is non-responsive to the interests of the Black and Hispanic communities in areas such as police violence,

public health, educational quality, housing conditions, and public funding decisions. The City has no programs aimed at addressing the stark racial disparities in Colorado Springs, making it less likely that Black and Hispanic residents will vote in April municipal elections.

Plaintiffs will also prove that the "important circumstances" identified by the Supreme Court in *Brnovich*, 141 S. Ct. at 2338, support their case. The burden that the City's unusually timed elections poses to all voters in Colorado Springs is extreme. Overall turnout in November even-year elections exceeds turnout in April odd-year elections by about 50 percentage points, with particularly extreme disparities for Black and Hispanic voters. Holding municipal elections in April of odd years is also an anomalous practice in Colorado, both historically and in the present. And the City does not permit early voting nor in-person voting in its municipal elections and does not send ballots to inactive voters, a group that is more Black and Hispanic, meaning the City's entire electoral system only compounds the overall and racial burdens the unusual timing of municipal elections imposes. Finally, Plaintiffs will demonstrate that the City has no strong interests in continuing to host its municipal elections an April of odd years. In fact, hosting municipal elections at other times would better serve the City's interests in increasing voter and media engagement with local issues, reducing the costs of elections, and generally promoting democratic values.

Plaintiffs will prove at trial that these extreme disparities, which violate the Voting Rights Act, harm each of their organizations. Plaintiff organizations devote significant resources to voter education and turnout. By holding April off-year elections, the City forces Plaintiffs to divert their resources from many other programmatic activities. The

disparate racial impact of these elections directly affects the communities that Plaintiff organizations work to serve.

Plaintiffs seek an order from the Court: (a) declaring that the timing of the City's April off-year municipal elections violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301; (b) permanently enjoining the City from holding future non-November municipal elections; (c) retaining jurisdiction to render any and all further orders that this Court may deem necessary; (d) awarding Plaintiffs their attorneys' fees in this action; (e) awarding Plaintiffs their costs of suit; and (f) granting any and all other relief this Court deems just and proper.

**Defendants:**

Elections in Colorado Springs are "equally open" to members of all racial and language groups in compliance with Section 2. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2337 (2021). Plaintiffs improperly view "the federal courts [as] merely publicly funded forums for the ventilation of public grievances," *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982), and the implementation of some social scientists' views of best election practices.

As a threshold matter, there is no private right of action to enforce Section 2, *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, __F. 4th__, 2023 WL 8011300 (8th Cir. Nov. 20, 2023), and even if there were, Plaintiffs would not possess it. Plaintiffs are corporate entities, not voters, and their asserted interest in cost-cutting falls well beyond Section 2's zone of interests. Plaintiffs should not be permitted to assert the rights of voters when they could not convince even one Black or Hispanic voter to join this suit. Importantly, given the Eighth Circuit's ruling in *Arkansas State Conference NAACP*,

the Supreme Court is likely to adjudicate the existence and scope of a Section 2 right of action in the near future and, pending developments in that matter, the City may request that the Court stay this action to await that guidance.

Plaintiffs' claim also fails on the merits. The Supreme Court expressly rejected their proposed disparate-impact test and held that equal openness (not equal turnout) is the "touchstone" of Section 2. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). Plaintiffs have no evidence that April elections in Colorado Springs are not equally open, and the Court should grant the City's summary judgment motion.

Plaintiffs will not in any event prove Section 2 liability. There is no "burden" imposed by the City's election timing, which presents an opportunity to vote and not a restriction on the franchise. *See id.* at 2338. Non-November elections are "standard practice" today, and they were the majority practice in 1982, when the current version of Section 2 was adopted. *See id.* at 2339. And, even if turnout could support Section 2 liability, there is no meaningful disparity in turnout: white, Black and Hispanic voters constitute very similar percentages of the electorate in April elections as compared to November even-year elections. *See id.* Plaintiffs have "artificially magnified" "very small differences" by dividing percentages, just as the Supreme Court condemned in *Brnovich*. *See id.* at 2339, 2344–45. The nation's leading municipal election scholar, Dr. Sarah Anzia, of the University of California, Berkeley, will demonstrate that Plaintiffs' approach to measuring turnout by ratios is nonsensical and produces absurd results—including here, where white turnout would need to exceed 100% for a disparity not to be shown. The City has many compelling reasons to conduct elections apart from federal elections to facilitate campaigns at a time of comparatively low expense, high resources, and potential for

visibility. It also has a compelling interest in continuity, which is paramount here: if Plaintiffs' requested injunction is granted, the City's first Black mayor will have a *three*-year term whereas all prior mayors have had *four*-year terms. That is not the outcome Section 2 was intended to produce.

The totality of the circumstances inquiry—even assuming it is properly invoked here—further supports the City. Plaintiffs do not even allege that voting is polarized along racial lines, which is a core consideration under Section 2. *See Thornburg v. Gingles*, 478 U.S. 30, 56–57 (1986). That omission defeats any contention by Plaintiffs that any City policy or any election result carries any probative weight (as Plaintiffs have no evidence of actual minority preferences). Plaintiffs' arguments will amount to nothing but political views and grievances. The City therefore intends to move *in limine* to exclude such evidence.

As for history, any Section 2 plaintiff in any American jurisdiction can find some degree of discrimination in its history. The Section 2 question is its "extent," *Gingles*, 478 U.S. at 36, and that extent here is as muted as anywhere in the nation. Colorado Springs was founded by an abolitionist, it never operated a segregated school system—as Denver once did—the Ku Klux Klan was defeated in multiple elections here—even as the Klan won control of Denver and the State—the City is one of the few major U.S. cities recognized in studies as racially integrated—Denver is highly segregated—and Plaintiffs identify no voting-related discrimination in the City within anyone's living memory. Importantly, Plaintiffs will be able to establish nothing of Colorado Springs that cannot equally be shown of Denver, which uses the same election timing, has perpetrated far

more discrimination in its history, and sees similar turnout patterns as Plaintiffs allege here.

That is ultimately the point. This case is not about Colorado Springs; it is about the views of legal and political-science visionaries who seek to leverage Section 2 to create a uniform national election day. Neither the Plaintiff entities nor anyone else in Colorado Springs arrived at the idea that the City's election timing is discriminatory; the Harvard Election Law Clinic brought this as a test case and solicited Plaintiffs' participation. Plaintiffs did not attempt to use democratic means to change the City's election timing. Notably, a vote of the City in November of an even-numbered year could deliver Plaintiffs all the relief they want, but they have not even tried that avenue. This is, then, not a case where structural barriers to proposed reform justify federal judicial intervention. *See Allen v. Milligan*, 599 U.S. 1, 30 (2023) (reiterating that "judicial intervention" in local elections should be "limited" to rare cases).

This is a test case for abstract ideas. But Plaintiffs' theory that November elections are required for every locality (or most) because Congress chose that election timing—for reasons few can remember—stretches Section 2 beyond its valid reach and beyond its constitutionally acceptable reach. The Court need not conduct an expensive and time-consuming trial to see that; it should grant summary judgment now.

### 4.    STIPULATIONS

a.  The parties stipulate to the following facts:

(1)     Colorado Springs holds its regular municipal elections to elect its Mayor and City Council members in April of odd years.

(2)     General elections for federal and statewide officials in Colorado take place in November of even years.

(3)      The City Clerk's office records show that 35.19% of registered voters returned a ballot in the April 4, 2023, Colorado Springs General Municipal Election.

(4)      The City Clerk's office records show that 39.68% of registered voters returned a ballot in the May 16, 2023, Colorado Springs Mayoral Runoff Election.

(5)      The City Clerk's office records show that 26.87% of registered voters returned a ballot in the 2021 Colorado Springs General Municipal Election.

(6)      The City Clerk's office records show that 37.11% of registered voters returned a ballot in the 2019 Colorado Springs General Municipal Election.

(7)      The City Clerk's office records show that 31.71% of registered voters returned a ballot in the 2017 Colorado Springs General Municipal Election.

(8)      The City Clerk's office records show that 42.66% of registered voters returned a ballot in the 2015 Colorado Springs Mayoral Runoff Election.

(9)      The City Clerk's office records show that 39.04% of registered voters returned a ballot in the 2015 Colorado Springs General Municipal Election.

(10)      The City Clerk's office records show that 39.49% of registered voters returned a ballot in the 2013 Colorado Springs General Municipal Election.

(11)      Article XI, 11-30 of the City's Charter states that all municipal elections shall be nonpartisan. The elected officers of the City are the Mayor and nine (9) members of the City Council who are elected at the general municipal election.

(12)      The Mayor and three (3) members of the City Council are elected at large.

(13)      Two current members of City Council are Hispanic and were elected in April odd-year elections. One of those elections was a special election to fill a vacancy.

(14)      In Colorado Springs' history, four Black individuals have been elected to City Council.

(15)      In Colorado Springs' history, seven Latino individuals have been elected to City Council.

### 5.      PENDING MOTIONS

Defendants' motion for summary judgment (ECF No. 60) is pending.

Though not a motion, Plaintiffs' law student appearance form for Morgan Hurst (ECF No. 41) remains pending. Plaintiffs respectfully request that the Court approve the appearance before trial.[1]

## 6.    WITNESSES

a.  Nonexpert witnesses to be called by each party:

<u>Plaintiffs:</u>

(1) Witnesses who will be present at trial:

- **Michael Williams**, who was disclosed by Plaintiffs as a representative of Plaintiff organization Citizens Project. Mr. Williams' testimony is expected to discuss the activities of Citizens Project, how Citizens Project is harmed by the April off-year elections, the impact of April off-year elections on voters, nonresponsiveness to the concerns of Black and Hispanic residents of the City, socioeconomic disparities among races in Colorado Springs, discrimination against Black and Latino people in Colorado Springs, and other social conditions in Colorado Springs.

- **Charles Montoya**, who was disclosed by Plaintiff as a representative of Plaintiff organization Colorado Latinos Vote. Mr. Montoya's testimony is expected to discuss the activities of Colorado Latinos Vote, how Colorado Latinos Vote is harmed by the April off-year elections, the impact of April off-year elections on voters, nonresponsiveness to the concerns of Black and Hispanic residents of the City, socioeconomic disparities among races in

---

[1] Plaintiffs also filed three other student appearance forms (ECF Nos. 39, 40, and 42) which are also awaiting approval. Those students are no longer with the Harvard Election Law Clinic. Plaintiffs respectfully withdraw those filings.

Colorado Springs, discrimination against Latinos in Colorado Springs, and other social conditions in Colorado Springs.

- **Shelly Roehrs**, who was disclosed by Plaintiffs as a representative of Plaintiff organization League of Women Voters of the Pikes Peak Region. Ms. Roehrs' testimony is expected to discuss the activities of the League of Women Voters of the Pikes Peak Region, how the League of Women Voters of the Pikes Peak Region is harmed by the April off-year elections, the impact of April off-year elections on voters, and other social conditions in Colorado Springs.

(2) Witnesses who may be present at trial if the need arises:

- **Donald Martinez**, who was disclosed by Plaintiffs as a representative of Plaintiff organization Black/Latino Leadership Coalition, may testify regarding the activities of the Black/Latino Leadership Coalition, how the Black/Latino Leadership Coalition is harmed by the April off-year elections, the impact of April off-year elections on voters, and other social conditions in Colorado Springs.

- **Eric Carnell**, who was disclosed by Plaintiffs as a representative of Plaintiff organization Black/Latino Leadership Coalition, may testify regarding the activities of the Black/Latino Leadership Coalition, how the Black/Latino Leadership Coalition is harmed by the April off-year elections, the impact of April off-year elections on voters, and other social conditions in Colorado Springs.

- **Carolyn Kalaskie**, who was disclosed by Plaintiffs as a representative of Plaintiff organization Black/Latino Leadership Coalition, may testify regarding

the activities of the Black/Latino Leadership Coalition, how the Black/Latino Leadership Coalition is harmed by the April off-year elections, the impact of April off-year elections on voters, and other social conditions in Colorado Springs.

- **Julie Ott**, who was disclosed by Plaintiffs as a representative of Plaintiff organization League of Women Voters of the Pikes Peak Region, may testify regarding the activities of the League of Women Voters of the Pikes Peak Region, how the League of Women Voters of the Pikes Peak Region is harmed by the April off-year elections, the impact of April off-year elections on voters, and other social conditions in Colorado Springs.

- **June Waller**, a member of the League of Women Voters of the Pikes Peak Region and the Black/Latino Leadership Coalition, may testify regarding the activities of these organizations, the impact of City election rules on voters, discrimination against Black residents of Colorado Springs, and other social conditions in Colorado Springs.

- **Max Kronstadt**, a co-founder of the Colorado Springs Pro-Housing Partnership, may testify regarding affordable housing and zoning in Colorado Springs.

- **Shaun Walls** may testify regarding education, discrimination, policing, and non-responsiveness in Colorado Springs.

- **Nikki Hernandez**, a member of the Law Enforcement Transparency and Advisory Commission, may testify regarding the Commission, its powers, and the policing of communities of color in Colorado Springs.

- **Janice Frazier**, the former Chair of the Law Enforcement Transparency and Advisory Commission, may testify regarding the Commission, its powers, and the policing of communities of color in Colorado Springs.

- **Danielle Summerville**, the City's ·Community Diversity and Outreach Programs Manager, may testify regarding her role and related activities at the City.

(3) Witnesses where testimony is expected to be presented by means of a deposition, and if not taken steno graphically, a transcript of the pertinent portions of the deposition testimony:

- **Travis Easton** provided testimony regarding the prevalence of sidewalks within the City.

- **Britt Haley** provided testimony regarding the February 2023 determination by the City that the League of Women Voters of the Pikes Peak Region could not use the rental space at the Hillside Community Center to host a candidate forum for the municipal election, and other similar determinations.

- **Sarah Ball Johnson** provided testimony regarding interests of the City in holding its municipal elections in April, including as compared to November; the procedures governing City elections, including the timing of elections, at-large methods of electing certain offices, the majority vote requirement, lack of VSPCs in City elections, the number and location of ballot dropboxes, redistricting, procedures for mailing ballots; inactive voters; turnout in elections in Colorado Springs; cost of City elections; and proposals to change features of City elections.

- **John Koch** provided testimony regarding racial disparities in the use of force by the Colorado Springs Police Department and other information contained in the report, "Assessment of Colorado Springs Police Department Use of Force," dated April 25, 2022, *see* Bates No. CITIZEN PROJECT - City 005834, and incidents of police misconduct.

- **Erin McCauley** provided testimony about the availability of Mountain Metropolitan Transit bus routes including the City's Title VI program.

- **Michael Montgomery** provided testimony about Lodgers and Automobile Rental Tax funded programs.

- **Steve Posey** provided testimony about whether the City has any programs, practices, or policies that have the express purpose of addressing racial differences in housing, education, income, or health between non- Hispanic white residents and Black and Hispanic residents of the City; the actions of Southeast Economic Vitality Regional Leadership; the Community Investment Trust, the Solid Rock Community Development Corporation; the Pikes Peak Community Foundation and others; and City partnerships and involvement in the United Way Family Center, the RISE Southeast, Thrive Network, Access COS, Springs Rescue Mission, Survive and Thrive, and Family Promise, among others.

- **Jariah Walker** provided testimony regarding the Colorado Springs Urban Renewal Authority funded projects and the use of urban renewal funding to develop newly annexed land.

- **Peter Wysocki** provided testimony regarding the City's comprehensive plan (PlanCOS) and zoning decisions, including ReToolCOS, particularly as related to residential zoning and health outcomes within the City, including differential life expectancy, the prevalence of "food deserts" or "food swamps," and the prevalence "urban heat islands" or areas lacking shade and tree cover in the Southeast.

<u>Defendants:</u>

(1) Witnesses who will be present at trial:

- **Sarah Johnson**, the City Clerk. She will testify to issues related to municipal elections and coordinated elections, election timing, campaigns, and social and political conditions in Colorado Springs.

(2) Witnesses who may be present at trial if the need arises:

- **Rev. Ben Anderson**, a pastor. He may testify to activities in southeast Colorado Springs, and social and political conditions in Colorado Springs.

- **Sam Arnold**, an analyst with the Economic Development Department. Mr. Arnold may testify to community outreach, engagement, programs and projects, and social and political conditions in Colorado Springs.

- **Cindy Aubrey**, the President and Chief Executive Officer of the Pikes Peak United Way. Ms. Aubrey may testify to United Way initiatives, partnerships and programs, and social and political conditions in Colorado Springs.

- **Yolanda Avila**, a Councilmember in District 4. She may testify to activities in her district, her experience running for a Council seat, other experience

running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Katie Carleo**, a Planning Manager. She may testify to City planning, and social and political conditions in Colorado Springs.

- **Anthony Carlson**, a campaign manager. He may testify to his experience running campaigns in Colorado and Colorado Springs, and social and political conditions in Colorado Springs.

- **Crystal Carr**, the Homelessness Prevention and Response Coordinator. She may testify to the City's initiatives and actions to prevent and respond to homelessness, and social and political conditions in Colorado Springs.

- **Cindy Conway**, a former City Clerk. She may testify to the City's response to a request to coordinate elections, and social and political conditions in Colorado Springs.

- **Bob Cope**, a former Economic Development Officer. Mr. Cope may testify to community outreach, engagement, programs and projects, and social and political conditions in Colorado Springs.

- **Lynette Crow-Iverson**, an at-large Councilmember. She may testify to activities in her district, her experience running for a Council seat, other experience running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Cari Davis**, the Executive Director of the Colorado Springs Health Foundation. she may testify to the initiatives and actions of the foundation, and social and political conditions in Colorado Springs.

- **Travas Deal**, the Chief Executive Officer of Colorado Springs Utilities. He may testify to Utilities infrastructure and initiatives, and social and political conditions in Colorado Springs.

- **Dave Donelson**, a Councilmember in District 1. He may testify to activities in his district, his experience running for a Council seat, other experience running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Travis Easton**, a Deputy Chief of Staff. He may testify to infrastructure, and social and political conditions in Colorado Springs.

- **Jeff Greene**, a former Chief of Staff. He may testify to City initiatives and actions, and social and political conditions in Colorado Springs.

- **Britt Haley**, a Parks Director. She may testify to the use of community centers and Parks initiatives and actions in Colorado Springs, and social and political conditions in Colorado Springs.

- **Mitch Hammes**, a Code Enforcement Service Manager. He may testify to code enforcement, and social and political conditions in Colorado Springs.

- **Randy Helms**, a Councilmember in District 2. He may testify to activities in his district, his experience running for a Council seat, other experience running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Steve Johnson**, a Senior Program Administrator with the Fire Department. He may testify to City actions and initiatives under the CARES programs,

and to address homelessness, mental health and addiction, and social and political conditions in Colorado Springs.

- **John Koch**, a police commander. He may testify to policing, and social and political conditions in Colorado Springs.

- **David Leinweber**, an at-large Councilmember. He may testify to activities in his district, his experience running for a Council seat, other experience running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Erin McCauley**, a Transit Services Supervisor. She may testify to transit services, and social and political conditions in Colorado Springs.

- **Blessing "Yemi" Mobolade**, the current Mayor of Colorado Springs. The Mayor may testify to his experience a candidate running for the Office of Mayor and City initiatives, and social and political conditions in Colorado Springs.

- **Michael Montgomery**, a Deputy City Council Administrator. He may testify to boards and commissions, and the Lodgers and Automobile Rental Tax Committee, and social and political conditions in Colorado Springs.

- **Eric Phillips**, a small business owner. He may testify to his experience as small business owner and experience on boards and commissions, and social and political conditions in Colorado Springs.

- **Steve Posey**, a Chief Housing Officer. He may testify to City housing activities and homelessness efforts, and social and political conditions in Colorado Springs.

- **Brian Risley**, an at-large Councilmember. He may testify to activities in his district, his experience running for a Council seat, other experience running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Danielle Summerville**, a Cultural and Community Outreach Programs Manager. She may testify to community outreach and engagement, programs and projects, and social and political conditions in Colorado Springs.

- **Hon. John Suthers**, the former mayor. He may testify to initiatives and actions of the City, and social and political conditions in Colorado Springs.

- **Michelle Talarico**, a Councilmember in District 3. She may testify to activities in her district, her experience running for a Council seat, other experience running for office, serving on boards and commissions, and social and political conditions in Colorado Springs.

- **Adrian Vasquez**, the Chief of Police. He may testify to policing and the Law Enforcement Transparency and Advisory Commission, and social and political conditions in Colorado Springs.

- **Jariah Walker**, the Executive Director of the Urban Renewal Authority. He may testify to Urban Renewal projects, volunteer and social welfare activities, and social and political conditions in Colorado Springs.

- **Wayne Williams**, a former Councilmember, candidate for the Office of Mayor, Clerk and Recorder, Lodgers and Automobile Rental Tax and Secretary of State. He may testify to his experience in these roles, to issues

related to City governance, issues as a candidate for public office, and to social and political conditions in Colorado Springs.

- **Peter Wysocki**, a Planning Director. He may testify to City planning, and social and political conditions in Colorado Springs.

- Defendants reserve the right to call or rely upon the testimony of any witness identified on Plaintiffs' witness list(s).

(3) Witnesses where testimony is expected to be presented by means of a deposition, and if not taken stenographically, a transcript of the pertinent portions of the deposition testimony:

- Defendants reserve the right to designate or counter-designate to the testimony of any witness identified on Plaintiffs' witness list as a witness whose testimony is expected to be presented by means of a deposition.

b.  Expert witnesses to be called by each party:

<u>Plaintiffs:</u>

(1) Witnesses who will be present at trial:

- **Dr. Zoltan Hajnal**, a professor of political science at the University of California San Diego, will testify about the matters raised in his expert report in this case, including but not limited to the effect of April off-year timing of Colorado Springs' municipal elections on racial disparities in voter turnout, the academic studies assessing the effects of local election timing on turnout, the historical levels of racial and ethnic minority representation on the City Council, the impact of at-large and majoritarian election systems, additional demographic analysis of the

socioeconomic conditions within the City, and his responses to Defendants' experts.

- **Dr. Julia Payson**, an assistant professor of political sciene at the University of California Los Angeles, will testify about the matters raised in her expert report in this case, including but not limited to the prevalence and origins of non-November municipal elections, the impact of off-cycle elections on responsiveness, accountability, and congruence, the validity of rationales for holding non-November municipal elections, and her responses to Defendants' experts.

- **Dr. Tom I. Romero, II**, an associate professor of law and history at the University of Denver, will testify about the matters raised in his expert report in this case, including but not limited to the history of racial discrimination in the State of Colorado and the City of Colorado Springs, and his responses to Defendants' expert.

(2) Witnesses who may be present at trial if the need arises: None Applicable

(3) Witnesses where testimony is expected to be presented by means of a deposition, and if not taken stenographically, a transcript of the pertinent portions of the deposition testimony: If Defendants do not have their expert witnesses testify at trial, Plaintiffs would offer deposition testimony of Dr. Michael Barber, Dr. Sarah Anzia, and Mr. Matthew Mayberry.

<u>Defendants:</u>

(1) Witnesses who will be present at trial:

- **Dr. Sarah F. Anzia**, an associate professor of public policy and political science at the University of California, Berkeley, will testify about the matters raised in her expert report in this case, including but not limited to turnout patterns by race, matters of the timing of municipal elections in Colorado Springs, the nature of voting in Colorado Springs, and her responses to the expert reports of Dr. Zoltan Hajnal and Dr. Julia Payson.

- **Dr. Michael Barber**, an associate professor of political science at Brigham Young University, will testify about the matters raised in his expert report(s) in this case, including but not limited to turnout patterns by race, matters of the timing of municipal elections in Colorado Springs, the nature of voting in Colorado Springs, and his responses to the expert reports of Dr. Zoltan Hajnal and Dr. Julia Payson.

- **Matthew Mayberry**, the director of the Colorado Springs Pioneers Museum, will testify as to the matters raised in his expert report(s) in this case, including but not limited to historical race relations in the City of Colorado Springs and the State of Colorado and his responses to the expert report(s) of Dr. Tom Romero.

(2) Witnesses who may be present at trial if the need arises: N/A

(3) Witnesses where testimony is expected to be presented by means of a deposition, and if not taken stenographically, a transcript of the pertinent portions of the deposition testimony: N/A

### 7.    EXHIBITS

a.  Exhibits to be offered by each party, including those stipulated into evidence:

(1) Plaintiffs: *See* "Appendix A" for Plaintiffs' exhibits to be offered.

(2) Defendants: *See* "Appendix B" for Defendants' exhibits to be offered.

b.  Copies of listed exhibits must be provided to opposing counsel and any *pro se* party no later than 30 days before trial.  The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8.    DISCOVERY

Discovery has been completed.

## 9.    SPECIAL ISSUES

The parties may need guidance from the Court regarding procedures for the use of documents at trial that have been designated "CONFIDENTIAL" under the terms of the stipulated protective order in this case, ECF No. 38.

## 10.    SETTLEMENT

a.  Counsel for the parties and any *pro se* party met by telephone on December 7, 2023, and discussed in good faith the settlement of the case.

b.  Counsel for all parties participated in the discussion of settlement.

c.  Counsel for the parties and any *pro se* party do not intend to hold future settlement conferences.

It appears from the discussion by all counsel and any *pro se* party that there is: No possibility of settlement.

d.  Counsel for the parties and any *pro se* party considered ADR in accordance with D.C.COLO.LCivRr.16.6.

## 11.    OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Because no claim for money damages is made, Rule 68 is inapplicable.

## 12.    EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice. The pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13.    TRIAL AND ESTIMATED TRIAL TIME;
## FURTHER TRIAL PREPARATION PROCEEDINGS

The trial is to the Court, expected to take place in Judge Sweeney's courtroom (A702) at the Alfred A. Arraj United States Courthouse. The Parties estimate the trial will take 7 days. The Parties understand that there will be a trial preparation conference closer in time to the trial.

DATED this 21st day of December, 2023.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

APPROVED:


 ELECTION LAW CLINIC                        OFFICE OF THE CITY ATTORNEY
HARVARD LAW SCHOOL                          Wynnetta P. Massey, City Attorney

/s/ Theresa J. Lee                          /s/ W. Erik Lamphere
Theresa J. Lee                              W. Erik Lamphere, Division Chief
Daniel Hessel*                              Tracy M. Lessig, Deputy City Attorney
Nicholas Stephanopoulos                     30 S. Nevada Ave., Suite 501
6 Everett Street, Suite 4105                Colorado Springs, Colorado 80903
Cambridge, MA  02138                        (719) 385-5909 / Fax (719) 385-5535
(617) 496-0370                              erik.lamphere@coloradosprings.gov
thlee@law.harvard.edu                       tracy.lessig@coloradosprings.gov
dhessel@law.harvard.edu
nstephanopoulos@law.harvard.edu             BAKER & HOSTETLER LLP

*Counsel for Plaintiffs*                    Patrick T. Lewis
* federal practice only                     plewis@bakerlaw.com
                                            127 Public Square, Suite 2000
                                            Cleveland, OH  44114-1214
                                            216.621.0200/ Fax 216.696.0740

                                            Richard B. Raile
                                            rraile@bakerlaw.com
                                            Washington Square, Suite 1100
                                            1050 Connecticut Avenue, N.W.
                                            Washington, DC  20036-5403
                                            202.861.1500 / Fax 202.861.1783

                                            *Counsel for Defendants*