IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:22-cv-01365-SKC-MDB

CITIZENS PROJECT,
COLORADO LATINOS VOTE,
LEAGUE OF WOMEN VOTERS OF THE PIKES PEAK REGION, and
BLACK/LATINO LEADERSHIP COALITION,

      Plaintiffs,

v.

CITY OF COLORADO SPRINGS, and
SARAH BALL JOHNSON, in her official capacity as City Clerk,

      Defendants.

---

ORDER DISMISSING PLAINTIFFS' CLAIM
FOR LACK OF ARTICLE III STANDING
AND FINDING AS MOOT DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. 60)

---

The above-referenced motion for summary judgment is now before the Court.

Plaintiffs are four nonpartisan, nonprofit organizations who bring this action for

declaratory and injunctive relief under the Voting Rights Act against Defendants City

of Colorado Springs ("City") and Sarah Ball Johnson in her official capacity as City

Clerk (collectively, "Defendants"). Plaintiffs bring a single claim arguing that the

timing of the City's municipal elections—held in April of odd-years as opposed to in

November of even-years—violates Section 2 of the Voting Rights Act (VRA), 52 U.S.C.

1

§ 10301, by disparately impacting the City's Black and Hispanic voters. They seek to permanently enjoin the City from holding future non-November municipal elections.[1] Plaintiffs assert jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4).[2]

Discovery has closed, and Defendants have moved for summary judgment. The matter is fully briefed. Dkts. 60 (Motion for Summary Judgment), 62 (Plaintiffs' Opposition); 63 (Defendants' Reply). Among other things, the parties argue over whether Plaintiffs have Article III standing. *Compare* Dkt. 60, p.9 *and* Dkt. 63, pp.2-3 *with* Dkt. 62, p.8. Because the Court finds Plaintiffs lack Article III standing, the Court lacks subject matter jurisdiction, and therefore, the Court dismisses this case without prejudice and finds the Motion is moot.

## UNDISPUTED MATERIAL FACTS

Founded in 1871, the City is a chartered home-rule municipality in El Paso County, Colorado, with a population of about 480,000. It began conducting April municipal elections at least as early as 1873.[3] The City currently conducts its regular municipal elections on the first Tuesday in April of odd-numbered years.

---

[1] While Plaintiffs seek a "[d]eclar[ation] that the timing of Colorado Springs' April off-year municipal elections violate[ ] Section 2 of the Voting Rights Act . . . ," they seek only an injunction barring the City "from holding future non-November municipal elections." Dkt. 1, p.38.

[2] Plaintiffs contend this Court also has jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

[3] There is no evidence the City has ever conducted municipal elections in November. Dkt. 60, ¶2; Dkt. 62, ¶2. There is also no evidence or allegation by Plaintiffs that the City adopted or maintained any election regulations with the intent to suppress the

As mentioned, Plaintiffs are four nonpartisan, nonprofit organizations that operate in the City of Colorado Springs and the Pikes Peak region.[4] Their respective activities include get-out-the-vote and voter-participation efforts:

- Plaintiff Citizens Project (CP) was founded in 1992 to oppose Colorado's Amendment 2, which sought to prohibit laws protecting LGBTQ citizens from discrimination. Dkt. 1, ¶11. Citizens Project's mission has evolved, and today it advocates for equity, inclusion, and justice in the Pikes Peak region. *Id.*

- Plaintiff Colorado Latinos Vote (CLV) was founded in 2020 to encourage members of Colorado's Latino community to register and vote; it works to empower and educate members of the Latino community in southern Colorado so they can participate in the democratic process and encourages its members to vote in every election, including the City's April off-year elections. *Id.* at ¶15.

- Active since 1937, Plaintiff League of Women Voters of the Pikes Peak Region (LWV-PPR) is the Colorado Springs-based chapter of the League of Women Voters of the United States. *Id.* at ¶21. It provides voter services and citizen education, and establishes positions on various issues of public importance and uses its positions to advocate for or against policies in the public interest. *Id.*

- Plaintiff Black/Latino Leadership Coalition (BLLC) was formed in 2006 in response to a lack of representation in civic decision making and access to information about matters vital to raising the quality of life for people of color in Colorado Springs and the Pikes Peak region. *Id.* at ¶25. It is devoted to promoting and advocating for positive change by bringing awareness to marginalized people on a variety of issues, policies, and programs available to them and by addressing their needs in the Pikes Peak

---

voting opportunity of any person on account of race, color, or language-minority status. Dkt. 60, ¶4; Dkt. 62, ¶4.

[4] The Colorado Office of Economic Development & International Trade identifies the Pikes Peak Region to include El Paso, Park and Teller counties. *See* https://choosecolorado.com/regional-profile/pikes-peak-region/.

region; its purpose is to enhance political, economic, and social cooperation between Black and Latino people. *Id.* at ¶¶25-26. In the runup to each election, the organization engages in various programmatic activities to boost voter turnout. *Id.* at ¶27.

- All Plaintiffs carry out their missions by working in their community to ensure access to the right to vote, including through voter education, voter registration, and get-out-the-vote activities. Dkt. 62, ¶21.

Between late 2021 and early 2022, the Harvard Election Law Clinic contacted three Plaintiffs about suing the City and using Section 2 of the VRA as a vehicle to change the timing of the City's municipal elections. That contact resulted in this lawsuit filed in June 2022, wherein Plaintiffs assert one cause of action under Section 2's "effects" test, claiming the City's spring municipal elections discriminate against Black and Hispanic voters, and asking the Court to permanently enjoin the City from holding future non-November municipal elections.

No voters have joined this lawsuit, and Plaintiffs concede they do not sue on behalf of their respective individual members. *Compare* Dkt. 60, ¶9 *with* Dkt. 62, ¶9. Instead, Plaintiffs allege injury only to themselves as organizations, contending the City's election timing causes them to divert and duplicate resources for their voter outreach. *Compare* Dkt. 60, ¶11 *with* Dkt. 62, ¶11. They also assert moving municipal elections to November would enable them to fund more activities because outside organizations are more willing to fund voter outreach in November of even years than the spring of odd years. *Id.*

More specifically, Plaintiff Citizens Project describes its injuries in this way:

13. . . . April off-year elections make it substantially more difficult for Citizens Project to continue in its civic-engagement activities and to further its mission by diverting time, money, and resources from its other voter engagement activities, activities on other issues to advance its mission, and its day-to-day operations. Citizens Project's budget provides for a limited staff of 2.5 full-time employees, and it relies, to a substantial degree, on organizing volunteers to deliver many of its services.

14. April off-year elections require Citizens Project to engage in duplicative "get out the vote" efforts, which it already performs for November elections. These duplicative "get out the vote" activities divert capacity from Citizens Project's other programmatic priorities. Additionally, April off-year elections overlap with the Colorado state legislative session, diverting limited employee and volunteer capacity from Citizen Project's legislative watchdog activities. Due to Citizen Project's limited budget and staff, it must deprioritize these other activities preceding April off-year elections, despite continued community need and demand during that time of the year.

Dkt. 1, pp.5-6; *see also* Dkt. 60, ¶11; Dkt. 61, ¶11. The other three Plaintiffs describe their injuries in identical, or materially similar, fashion. Dkt. 1, ¶¶19-20 (Plaintiff CLV), 23-24 (Plaintiff LWV-PPR), 30 (Plaintiff BLLC); *see also* Dkts. 60, ¶11; 61, ¶11.

## LEGAL STANDARD

Defendants have moved for summary judgment. But the Court always has an obligation to determine whether it has subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). As courts of limited jurisdiction, federal courts must have a specific legal basis for their jurisdiction. *See Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th

Cir. 1994)). And Article III standing is an issue of a court's jurisdiction. *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021).

The determination of a court's subject matter jurisdiction is a question of law. *Madsen v. U.S. ex rel. U.S. Army, Corps of Eng'rs*, 841 F.2d 1011, 1012 (10th Cir. 1987). "A court lacking jurisdiction cannot render judgment . . . ." *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir. 1974). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

When a court recognizes a problem with its subject matter jurisdiction, summary judgment becomes inapposite. *Thompson v. United States*, 291 F.2d 67, 68 (10th Cir. 1961) ("A motion for summary judgment lies whenever there is no genuine issue as to any material fact. It is not a substitute for a motion to dismiss for want of jurisdiction. If the court lacks jurisdiction it cannot render a judgment but must enter an order dismissing the action."). *See also Moody v. United States*, 202 F.3d 282 (Table), 1999 WL 1127634, at *2 (10th Cir. 1999) ("[I]t is well established summary judgment is an inappropriate vehicle for raising a question concerning the subject matter jurisdiction of the court. For these reasons, we agree the district court should have determined whether it had subject matter jurisdiction in this case under Rule 12(b)(1) prior to considering a motion for summary judgment." (cleaned up and citations omitted)).

## ANALYSIS AND FINDINGS

As a threshold matter, Defendants argue Plaintiffs lack Article III standing.[5] Article III standing is a "bedrock constitutional requirement." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting *United States v. Texas*, 599 U.S. 670 ,675 (2023)). Article III of the Constitution limits the federal courts' jurisdiction to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Because Article III standing is an issue of a court's jurisdiction, a court must first satisfy itself that it exists. *Kerr*, 20 F.4th at 692.

To possess Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These requirements are "an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* at 560. And they help to ensure that a plaintiff is not "a mere bystander, but instead [has] a 'personal stake' in the dispute." *All. for Hippocratic Med.*, 602 U.S. at 378 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases,

---

[5] In a footnote, Plaintiffs say, "[i]t appears that the City concedes that Plaintiffs have Article III standing and limits its argument on standing to the contention that Plaintiffs lack statutory standing." Dkt. 62, p.8, n.1. But the perceived concession is an illusion. Dkt. 63, §I(B) (Defendant's Reply stating, "[e]ven if that might support Article III standing—which the City does not concede . . . .").

as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* at 379 (citation omitted).

Organizations, like Plaintiffs, have two methods to achieve Article III standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). They can claim organizational standing because they suffered an injury of their own, or they can claim associational standing based on injuries suffered by their members. *Id.* But Plaintiffs do not claim associational standing. *Compare* Dkt. 60, ¶¶9, 11 *with* Dkt. 62, ¶¶9, 11. Thus, for Article III purposes, they must demonstrate they have organizational standing. *See New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (plaintiff sued under a theory of organizational standing, not associational standing, because it did not sue on behalf of injured members).

As noted above, each Plaintiff claims a diversion of its resources for purposes of the injury-in-fact component of Article III standing. Dkt. 1, ¶¶13-14, 19-20, 23-24, 30. According to Plaintiffs, these reroutes include things like diverting time, money, and resources from their other civic or voter engagement activities and their day-to-day operations; duplicating November "get out the vote" efforts; diverting limited employee and volunteer capacity; and deprioritizing other activities preceding April off-year elections. Dkt. 1, ¶¶13-14, 19-20, 23-24, 30; *see also* Dkt. 60, ¶11; Dkt. 61, ¶11.

But these are the same types of injuries the medical-association plaintiffs claimed in *Alliance for Hippocratic Medicine*, and which the Supreme Court rejected for purposes of organizational standing.[6] *All. for Hippocratic Med.,* 602 U.S. at 393-96. There, four pro-life medical associations (along with physicians) sought judicial review under the Administrative Procedure Act in their challenge to the Food and Drug Administration's (FDA) approval of standards surrounding the administration of mifepristone—a medical abortion-inducing drug. Relying on the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the medical associations claimed they had suffered their own injuries for Article III standing purposes:

> They claim to have standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions. They say that FDA has "caused" the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks. They contend that FDA has "forced" the associations to "expend considerable time, energy, and resources" drafting citizen petitions to FDA, as well as engaging in public advocacy and public education. And all of that has caused the associations to spend "considerable resources" to the detriment of other spending priorities.

*All. for Hippocratic Med.,* 602 U.S. at 394 (internal record citations omitted).

The Supreme Court deemed these injuries insufficient to confer organizational standing. Drawing a contrast, it explained that the injuries claimed by the organization in *Havens* directly affected and interfered with that organization's "core

---

[6] The Supreme Court's decision in *Alliance for Hippocratic Medicine* issued nearly 10 months after full briefing on Defendants' Motion for Summary Judgment.

business activities [of providing housing counseling services to low-income persons]—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. It found the FDA's actions imposed no similar impediment on the medical associations' advocacy business. *Id.* And it cautioned that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396; *see also Tenn. Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, No. 24-5546, 2024 WL 3219054, at *12 (6th Cir. June 28, 2024) ("Just weeks ago, the Supreme Court clarified that *Havens's* 'unusual' facts did not support a categorical rule allowing standing whenever 'an organization diverts its resources in response to a defendant's actions.'" (citation omitted)). Speaking of the diversion-of-resource injuries claimed by the medical associations, the Supreme Court explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *All. for Hippocratic Med.*, 602 U.S. at 394.

Yet this is what Plaintiffs appear to have done here—*i.e.*, manufacture their own standing. *See id.* at 395 ("Indeed, that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies."). To be sure, the timing associated with Plaintiffs' purported diversion of resources

suggests their fabrication of their standing. The City has held its municipal elections in April as early as 1873. The Plaintiff organizations were founded multiple decades (and sometimes over 100 years) later, meaning the City conducted April elections for numerous years before these organizations existed, and it has continued to hold April elections well after the founding of these organizations.[7] It wasn't until between 2021 and 2022, when the Harvard Election Law Clinic contacted Plaintiffs about suing the City under Section 2 of the VRA to change the timing of its municipal elections, that Plaintiffs brought this lawsuit. This chronology demonstrates the abstract nature of Plaintiffs' claimed injuries, which seem to be supported only by their decision to now oppose the timing of the April elections in federal court, and to do so without any voters as plaintiffs and without suing on behalf of their individual members.[8]

Even more, the summary judgment record shows that Plaintiffs have *already* been using their respective resources on voter education programs and initiatives to

---

[7] Plaintiff LWV-PPR active since 1937; Plaintiff CP founded in 1992; Plaintiff BLLC founded in 2006; and Plaintiff CLV founded in 2020.

[8] Contrast this timing with the timing of the diversion-of-resources injuries claimed in the cases Plaintiffs cite in support of their standing argument. Dkt. 62, n.1 (citing *Havens* and *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952-55 (7th Cir. 2019) (collecting cases)). In those cases, existing organizations were impacted by *later* legislative enactments or other government actions the organizations then diverted resources to address. *See generally* the cases cited in Dkt. 62, n.1. None of this is to say that a party cannot appropriately challenge a statute, program, or practice that preceded the party's inception, but under the facts of this case, the timing militates against finding an injury-in-fact.

11

educate Black, Hispanic, and other voters.[9] "Courts have distinguished between cases where a defendant's conduct forced a plaintiff to divert its resources and provide *new* services, therefore giving rise to organizational standing, and cases where a plaintiff was *already* providing the services at issue and therefore failed to allege any injury." *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 657 (S.D.N.Y. 2019), *aff'd as modified sub nom* (citations omitted)*; see also New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) (comparing cases); *Fair Elections Ohio*, 770 F.3d 456, 459-60 (6th Cir. 2014) ("[I]t is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already[.]"); *cf. All. for Hippocratic Med.*, 602 U.S. at 394 ("[A]n organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization[.]' A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" (internal citations omitted)).

The decision in *Fair Elections Ohio, supra*, further exemplifies the point. There, an organization conducting voter outreach sued the Ohio Secretary of State

---

[9] Dkt. 62-1 (CP depo.), 25:20-24, 29:3-30:25, 36:8-20, 79:21-80:25, 109:1-110:19; Dkt. 62-3 (LWV-PPR depo.), 19:20-25, 29:3-14,41:10-44:22; Dkt. 62-7 (BLLC depo.), 26:21-27:7at 32:11-33:10; 41:6-42:15; 43:3-12; Dkt. 62-9 (CLV depo.), 34:8-25; 70:10-71:25; see also Dkt 1, ¶¶15, 21, 27; Dkt. 62, ¶21 ("All of the Plaintiffs carry out their missions by working in their community to ensure access to the right to vote, including through voter education, voter registration, and get-out-the-vote activities.).

and Attorney General for violating Section 2 of the VRA (among other constitutional claims). *Fair Elections Ohio*, 770 F.3d at 459. The plaintiff challenged a "years-old" absentee ballot procedure that allowed hospitalized voters to obtain absentee ballots later than jailed voters. *Id.* at 459-60. The Sixth Circuit found the plaintiff had not shown an injury in fact to give it standing to challenge the "years-old" law. *Id.* The circuit court explained:

> [I]f the armchair observer decides that the government is violating the law, and decides to stop it by suing, that is not enough. This limit would be eviscerated if an advisor or organization can be deemed to have Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law. Plaintiffs in this case have demonstrated no more than this.

*Id.* at 460. The Court finds the reasoning in *Fair Elections Ohio* persuasive and similarly applicable to the injuries Plaintiffs claim here.

Plaintiffs lack Article III standing because they have failed to demonstrate an injury in fact. *See, e.g., Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397 (10th Cir. 1992) ("Appellants' [standing] argument that they were forced to counteract the Governor's activities through the expenditure of additional funds is purely conjectural."); *see also Murthy v. Missouri*, --- U.S. ---, 2024 WL 3165801, at *7 (June 26, 2024) ("[f]ederal courts can only review statutes and executive actions when necessary to redress or prevent actual or imminently threatened injury" (cleaned up)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the

law in the course of doing so."). But Plaintiffs speak in absolutes, contending that if this Court endorses the argument that groups dedicated to serving voters lack organizational standing, "it would be the first court, anywhere, to do so." Dkt. 62, p.2. At least two things demonstrate the lack of novelty around the Court's conclusion that *these* Plaintiffs lack Article III standing.

First, Plaintiffs' categorical proposition is reckless and untrue—other federal courts have found voter entities to lack organizational standing on voter issues. *See Texas State LULAC v. Elfant*, 52 F.4th 248, 253-54 (5th Cir. 2022) (voter registration organizations lacked standing to challenge Texas law revising requirements for voter residency); *Fair Elections Ohio*, 770 F.3d at 460 (voter outreach organization lacked standing to challenge state voting law); *Wash. Election Integrity Coal. United v. Hall*, 634 F. Supp. 3d 977, 984 (W.D. Wash. 2022) (voting rights organization lacked standing to bring action alleging election auditor's conduct violated federal constitutional rights); *Wisc. Voters All. v. Pence*, 514 F. Supp. 3d 117, 120 (D.D.C. 2021) (voter groups lacked standing to seek declaration that federal statutes governing electors and the counting of electoral votes were unconstitutional); *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, No. 2:18-cv-02706-TLP-DKV, 2019 WL 4394754, at *7 (W.D. Tenn. Sept. 13, 2019), *aff'd* 947 F.3d 977 (6th Cir. 2020) (voting organization lacked standing to challenge state and county voting systems).

Second, the Supreme Court's recent decision in *All. for Hippocratic Med.*, *supra*, susses out the narrow scope of the diversion-of-resources injury claimed by

14

Plaintiffs here. The fact that Plaintiffs are dedicated to serving voters is not enough to confer organizational standing. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." (citation omitted)); *cf. All. for Hippocratic Med.*, 602 U.S. at 396 ("[S]ome issues may be left to the political and democratic processes[.]"). Plaintiffs must still satisfy the requisites of standing under Article III. *Murthy*, 2024 WL 3165801, at *8 (plaintiff bears the burden to establish standing as of the time it brought the lawsuit and keeping it thereafter). They have not done so on this record.

*     *     *

For the reasons shared above, the Court DISMISSES WITHOUT PREJUDICE Plaintiffs' claim because they lack Article III standing, and thus, this Court lacks subject matter jurisdiction.[10] The Court FINDS AS MOOT Defendants' Motion for Summary Judgment (Dkt. 60). The Court ORDERS that the Clerk of Court shall terminate this action. The Court FURTHER VACATES the bench trial set to commence on August 19, 2024, and any related deadlines.

---

[10] Because the Court finds Plaintiffs lack Article III standing, it does not address whether Plaintiffs have statutory standing under the VRA, nor does it address the parties' additional arguments on the merits.

DATED: July 9, 2024

BY THE COURT:

S. Kato Crews
United States District Judge