IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CITIZENS PROJECT, COLORADO
LATINOS VOTE, LEAGUE OF
WOMEN VOTERS OF THE PIKES
PEAK REGION, and BLACK/LATINO
LEADERSHIP COALITION,

    *Plaintiffs*,

v.

    No. 22-cv-01365-SKC-MDB

CITY OF COLORADO SPRINGS, and
SARAH BALL JOHNSON, in her
official capacity as City Clerk,

    *Defendants*.

**PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................i
LEGAL STANDARD .....................................................................................................1
ARGUMENT...................................................................................................................2
   A.     Reconsideration Is Appropriate.................................................................2
   B.     Plaintiffs Have Article III Standing to Bring Their Claim. ......................4
      1.     Plaintiffs suffer cognizable harm. ...............................................................5
      2.     *FDA* does not undermine Plaintiffs' standing. ............................................10
      3.     The other cases relied upon are also distinguishable..................................12
CONCLUSION ..............................................................................................................15
CERTIFICATION OF CONFERRAL.........................................................................17
CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE ....18

Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs Citizens Project, Colorado Latinos Vote, League of Women Voters of the Pikes Peak Region, and Black/Latino Leadership Coalition move this Court to alter its Judgment, ECF 94.

Plaintiffs respectfully request that the Court reconsider its dismissal. ECF 93 (the "Order"). Plaintiffs' opposition, ECF 62, to Defendants' Summary Judgment Motion, ECF 60, addressed Defendants' argument that Plaintiffs lack *statutory* standing. Because Defendants brought up Article III standing in the context of distinguishing it from statutory standing, Plaintiffs understood Defendants not to be arguing that Plaintiffs lacked Article III standing and therefore did not brief that issue. Nor did Plaintiffs or Defendants address how or whether *Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*FDA*")—issued nearly ten months after briefing concluded—impacted Plaintiffs' Article III standing here. 602 U.S. 367 (2024).

As set forth below, Colorado Springs' practice of holding municipal elections in April of odd years causes Plaintiffs to expend resources and duplicate efforts to boost turnout and serve voters. As a result, the challenged practice prevents Plaintiffs from using those finite resources on their other core programmatic activities. That impairment of Plaintiffs' core activities is a concrete, particularized, and cognizable injury, and Plaintiffs respectfully request that the Court reconsider its decision and conclude that Plaintiffs have Article III standing.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 59 authorizes a court to "alter or amend a

1

judgment" within "28 days after entry of the judgment," Fed. R. Civ. P. 59(e), "enabl[ing] a district court to reverse a mistaken judgment, and so make an appeal altogether unnecessary," *Banister v. Davis*, 590 U.S. 504, 516 (2020). "The rule also has been interpreted as permitting a motion to vacate a judgment rather than merely amend it." Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed.). Motions to reconsider a final judgment fall within the Rule. *See Chesson v. Jaquez*, 986 F.2d 363, 365 (10th Cir. 1993). Courts have "broad discretion" in considering whether to grant a Rule 59 motion. *Reyes v. Snowcap Creamery, Inc.*, No. 11-CV-02755-JLK-KMT, 2014 WL 1101446, at *1 (D. Colo. Mar. 20, 2014).

## ARGUMENT

**A. Reconsideration Is Appropriate.**

Reconsideration under Rule 59(e) is appropriate in this case. "A motion for reconsideration is proper when the court has patently misunderstood a party, has made a decision outside the adversarial issues presented, has made a mistake not of reasoning but of apprehension, or there has been a significant change or development in the law or facts since submission of the issues to the court." *Gregg v. Am. Quasar Petroleum Co.*, 840 F. Supp. 1394, 1401 (D. Colo. 1991). These circumstances apply.

Dismissing Plaintiffs' claim, the Order concluded that Defendants were making an affirmative Article III standing argument. For example, it began by stating that, "[a]s a threshold matter, Defendants argue Plaintiffs lack Article III standing." ECF 93 at 7. But Defendants' summary judgment motion mentioned Article III standing only in the context of distinguishing it from the statutory

2

standing argument Defendants made. ECF 60 at 9 ("Even if Plaintiffs have recourse to that doctrine [of organizational harm], it satisfies only the standing requirements of Article III." (marks omitted)); *id.* ("To be sure, an organization might in some cases bring a § 2 claim by asserting 'standing solely as the representative of its members,' who might be proven to have Article III standing."). The substance of Defendants' standing argument was about statutory standing. *See id.* at 7–11 (arguments under heading "Plaintiffs Lack Statutory Standing To Prosecute A Section 2 Claim").

The Order cited Defendants' reply brief to note that Defendants had not conceded Article III standing. ECF 93 at 7 n.5. That brief was filed after Plaintiffs' opposition pointed out Defendants had made no Article III arguments in their original motion. *Id.* In reply, Defendants offered a single, cursory argument that one of Plaintiffs' asserted interests could not alone satisfy Article III. ECF 63 at 2. Accordingly, the parties did not brief Article III standing. Plaintiffs did not do so in opposition as Defendants did not seek summary judgment on Article III standing. Plaintiffs' briefing followed Defendants' lead. So did the evidence they submitted to oppose summary judgment. Plaintiffs recognize that the Court may dismiss a case for lack of jurisdiction at any time. But a motion for reconsideration is proper to provide fulsome adversarial briefing and submission of evidence on the Article III standing issue. *See Gregg*, 840 F. Supp. at 1401 ("A motion for reconsideration is proper when the court . . . has made a decision outside the adversarial issues presented.").

Plaintiffs understand that the Court believed they overstated an argument in their opposition brief. ECF 93 at 14. The Order stated that Plaintiffs' "categorical

3

proposition" that no court had ever accepted Defendants' argument was "reckless and untrue," citing a series of cases in which "other federal courts have found voter entities to lack organizational standing on voter issues." *Id.* Plaintiffs respectfully submit that their assertion that no court had accepted Defendants' argument directly spoke to Defendants' argument that organizations categorically lack *statutory* standing under the VRA. Plaintiffs remain unaware of any case in which a court has accepted that argument. Plaintiffs take their ethical obligations seriously and did not intend to mislead the Court. They certainly did not mean to claim that no other federal court had "found voter entities to lack organizational standing on voter issues." *Id.* With respect to Article III standing, organizations must demonstrate a concrete injury caused by a defendant's action, and Plaintiffs maintain that they have done so here, as explained below.

Further, the Order addressed a Supreme Court decision—*FDA*—that postdated summary judgment briefing by nearly ten months. While, as explained below, *FDA* did not upend Article III organizational standing doctrine, it does reflect the Court's latest word on the subject. Given *FDA*'s centrality to the Order's analysis, reconsideration after fulsome briefing on *FDA* is appropriate. *See Gregg*, 840 F. Supp. at 1401 ("motion for reconsideration is proper when . . . there has been a significant change or development in the law . . . since submission of the issues to the court").

**B. Plaintiffs Have Article III Standing to Bring Their Claim.**

In reconsidering its Order, ECF 93, and altering its judgment, ECF 94, this Court should conclude that Plaintiffs have Article III standing to challenge the timing

4

of Colorado Springs' municipal elections.

### 1. Plaintiffs suffer cognizable harm.

The Supreme Court has long recognized that an organization has standing to challenge a policy that impairs the organization's core activities by draining its resources. *Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982). The plaintiff in *Havens* was a housing organization that "provide[d] counseling and referral services for low-and moderate-income homeseekers." *Id*. at 379. It sued an apartment complex owner over steering practices in which the defendant lied to Black prospective renters about the availability of apartments, alleging that it had to "devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 366–68, 378–79. The Court held that the plaintiff could establish standing under those circumstances. It explained that the "drain on the organization's resources" was "a concrete and demonstrable injury to the organization's activities" and not merely a non-actionable "setback to the organization's abstract social interests." *Id*. In the election context, courts have recognized that, "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of that law that are harmful to the organization's mission." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (citation omitted); *see also Fla. State Conf. of NAACP. v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (finding standing where "organizations reasonably anticipate that they will have to divert personnel and time" and "[t]hese resources would otherwise be spent on registration drives and election-

5

day education and monitoring"); *Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010) (finding "*Havens*-style standing on grounds [plaintiff groups] diverted substantial resources in 2008, and will likely do so again in this election, dealing with phone calls related to pre-election voter list 'purges'/cancellations").

Plaintiffs here are the types of organizations whose standing courts have recognized. Their missions involve broadening political participation, engaging the community, educating voters, and advancing racial justice. Plaintiffs have testified that the City's unusual election timing makes that work more difficult by sapping resources from core activities and forcing them to duplicate efforts. As one witness described it: With "the spring municipal, you're doing double the effort, double the time and money." Pls.' App'x at 137, Roehrs Tr. 173:13-14; *see also id.* at 129-30, 136, at 144:22-145:3, 169:15-170:16; *id.* at 38, 39-40, Williams Tr. 86:14-87:12, 90:7-92:25, 190:11-192:14 (discussing various efforts from which resources were diverted, including "legislative report card being delayed now because of our municipal election"); *id.* at 231-34, Lee Decl. Exs. 5-6 (Citizens Project budget reflecting "two elections" and fundraising appeal reflecting double elections); *id.* at 169, Montoya Tr. 87:6-19 (municipal elections divert from efforts to expand in southern Colorado).

Each of the Plaintiff organizations provides substantial services to the communities in which they work, both related to voting and otherwise. Citizens Project does "equity, inclusion and justice work," *id.* at 23, Williams Tr. 24:23-25, and aims to "mak[e] sure that . . . people have access and are aware of ways to be civically

6

engaged," including through electoral participation, *id.*, Williams Tr. 25:11-13. It hosts educational events to inform the public of various races on the ballot, community events to promote voting, and candidate forums. *Id.* at 23, 39, 40, Williams Tr. 26:20-27:12, 90:14-23, 92:15-25; *see also id.* at 256-89, Lee Decl. Exs. 15-20. It publishes and promotes a voter guide for each election. *See, e.g., id.* at 290-358, Lee Decl. Exs. 21-26. It hosts community engagement series to facilitate conversations on matters of public concern. *Id.* at 23, Williams Tr. 26:11-12; *see also id.* at 235-55, Lee Decl. Exs. 7-14. It also monitors the legislative session and creates and publicizes a legislative report card. *See, e.g., id.* at 359-82, Lee Decl. Exs. 27-28. And but for the City's April elections, Citizens Project could devote more of its limited resources to creating and publicizing its annual legislative report card, publishing and promoting candidate and issue guides for November elections, working in the community on racial justice issues such as housing, policing reform, education, and healthcare access, or promoting turnout in November elections. *Id.* at 64-65, 36, 39-40, Williams Tr. 190:16-19, 192:1-14 (legislative report card), 191:4-19 (other civic engagement), 77:21-78:2 (efforts regarding policing); 90:7-92:25 (explaining cost savings of consolidated GOTV efforts); *see also id.* at 383-99, Lee Decl. Exs. 29-30.

The League of Women Voters of the Pikes Peak Region's (LWVPPR) "mission is to improve our system of government and impact public policy through citizens education and voter services." *Id.* at 101, Roehrs Tr. 29:4-6. It advances that mission through voter services, including education, registration, "community conversations," and turnout efforts. *Id.* at 104, Roehrs Tr. 42:6-44:5; *id.* at 400-09, 412-28, 431-53,

7

459-64, Lee Decl. Exs. 31, 33, 35-36, 39-40 (reflecting core activities). It relies on volunteer efforts for "community conversations, which is [its] civics education," in the form of "out-in-the-community events, [that] help with educating our community about" public policy. *Id.* at 102, 104, Roehrs Tr. 33:22-34:8, 42:21-24; *see also id.* at 410-11, 429-30, 454-58, Lee Decl. Exs. 32, 34, 37-38. It also organizes informational sessions on ballot issues, *id.* at 111, Roehrs Tr. 71:21-72:12; *see also id.* at 459-74, Lee Decl. Exs. 39-43, and takes positions on certain public policies, based on "a lot of time and dedicated people and a lot that goes into those issues that [it] want[s] to research that [it] feel[s] are important and benefit the community as a whole." *Id.* at 102-03, Roehrs Tr. at 36:22-37:3; *see also id.* at 400-09, 475-82, Lee Decl. Exs. 31, 44-46. But for the election timing, LWVPPR could use its limited resources to host additional "community conversations," or engage in more policy work, or publicize additional information on ballot measures, or register and turn out more voters for November elections, or expand its reach beyond El Paso County. *See id.* at 98, 100, 116-17, 136, Roehrs Tr. 17:3-9 (efforts to expand work); 26:9-12 (civic education); 90:16-93:8 (City Council work regarding alternative voting systems); 169:15-170:16.

Colorado Latinos Vote "is dedicated to expanding Latino/a/x voter engagement in Colorado. [It] work[s] to educate and empower members of [the Latino] community to participate more fully in the democratic process." *Id.* at 156, Montoya Tr. 34:15-25. It engages in voter registration efforts with a particular focus on cultural events frequented by Latino residents. *Id.* at 159, Montoya Tr. 44:2-16. It also organizes voter registration drives at local high schools and colleges. *Id.*, Montoya Tr. 44:17-

8

22; *id.* at 483-92, Lee Decl. Exs. 47-49. While it relies largely on volunteers, it gave stipends to "a couple of college students" to help with its efforts prior to the November 2022 elections, for which it registered over 500 voters. *Id.* at 150, 161, Montoya Tr. 11:20-23, 53:14-16. It has supported efforts by other organizations, including LWVPPR, to host candidate forums ahead of municipal elections, and organized several efforts specific to the April 2023 municipal elections. *Id.*, Montoya Tr. 52:2-53:23. It has also engaged in advocacy regarding equitable placement of ballot boxes. *Id.* at 163-64, Montoya Tr. 63:25-66:6. But for the election timing, CLV could use its limited resources to register more voters at high schools and Latino-focused cultural events, expand its efforts in other parts of southern Colorado, or offer additional stipends to enable students to help register more voters. *Id.* at 159, 169, 150, Montoya Tr. 44:4-16 (efforts to register voters at Latino-focused events); 44:17-45:22 (voter registration drives at high schools and colleges); 87:6-19 (desire to expand beyond Colorado Springs); 11:20-23 ("stipend" for "a couple of college students" during 2022 efforts); *id.* at 493-501, Lee Decl. Exs. 50-52.

Black/Latino Leadership Coalition (BLLC) works to "bring[] awareness to marginalized people on a variety of issues, policies and programs . . . and addressing their needs." *Id.* at 194, Martinez Tr. 22:8-17. Its members participate in forums on public policy, it is active in sharing information with the community on social media, and it meets with elected officials and attends public meetings to gather information to disseminate to community members. *Id.* at 195-97, Martinez Tr. 27:1-7, 29:6-30:10, 35:19-36:13. It has studied and disseminated health-related information regarding

9

"mental health and [ ] respiratory health near the power plant or heart attack risks for people of color," as well as COVID-related issues. *Id.* at 198, Martinez Tr. 39:7-12. But for the City's April elections, BLLC could use its limited resources to participate in additional efforts to monitor government action on issues affecting Black and Latino residents, hold more informational events on community services, or to recruit more election judges, *id.* at 199-200, Martinez Tr. 43:13-45:4 (election judges).

This reflects only a fraction of Plaintiffs' core activities—and from which they must divert resources to educate voters about, and promote voting in, the City's April elections. Those are concrete, cognizable Article III injuries under *Havens* and remain so after *FDA*. *See also OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (standing where plaintiff "undertook to educate voters" about law, "an undertaking that consumed its time and resources in a way they would not have been spent absent the [] law.").

   *2. FDA does not undermine Plaintiffs' standing.*

*FDA* did not upend the existing *Havens* framework or undermine Plaintiffs' standing. There, plaintiffs were advocacy organizations opposed to an FDA policy regarding mifepristone access. They asserted standing "based on their incurring costs to oppose FDA's actions," including by "'expend[ing] considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education" to oppose the policy. 602 U.S. at 394. The Court rejected that theory of harm, explaining that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by

10

expending money to gather information and advocate against the defendant's action." *Id.* Concluding otherwise, the Court explained, would invite any organization to bootstrap standing to "challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.

But *FDA* reaffirmed *Havens*' central premise: an organization has standing to challenge a policy that interferes with its core activities. *FDA*, 602 U.S. at 395. The key conclusion from *FDA* is that an organization may not establish standing to challenge a policy based on resources expended *in opposition to* that policy; but it can establish standing where it must divert resources from core activities *because of* that policy. As *FDA* explains, *any* organization could challenge *any* policy if it could establish standing merely by expending resources on advocacy against that very policy. *Id.* But that's not true when an organization must expend resources, not to oppose a policy, but because that policy impacts its core activities. In that situation, the harm is concrete and particularized. *Id.* (citing *Havens*, 455 U.S. at 379).

Plaintiffs are akin to the *Havens* plaintiff and entirely unlike the *FDA* plaintiffs. Here, the challenged policy causes Plaintiffs to duplicate their voter education and turnout efforts—these resources are spent *because of* the challenged election timing, but not *in opposition to* it. That means that Plaintiffs' resources are diverted in a concrete and particularized way—causing a harm much more tangible than "a setback to [an] organization's abstract social interests." 602 U.S. at 394.

The Order analogized Plaintiffs here to the *FDA* plaintiffs and concluded that Plaintiffs "manufacture[d] their own standing." ECF 93 at 10. The Order pointed to

11

the timing of when Plaintiffs brought this lawsuit and asserted that Plaintiffs' claimed injuries "seem to be supported only by their decision to now oppose the timing of the April elections in federal court." *Id.* at 11. But Plaintiffs do not seek to establish standing to challenge the City's election timing by pointing to resources spent in opposition to that timing. Plaintiffs agree that neither the efforts associated with this lawsuit nor their previous efforts[1] opposing the City's election timing suffice for standing. Those efforts parallel what the organizations in *FDA* did—expending resources in opposition to a policy. What distinguishes Plaintiffs here from those in *FDA* is that independent of their efforts to challenge the City's election timing, they are forced, because of that timing, to expend additional resources, thus reducing the resources that Plaintiffs can devote to their core activities.

3. *The other cases relied upon are also distinguishable.*

The Order cited *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014), as persuasive because the Sixth Circuit found the plaintiff had no standing to challenge a "years-old" law, ECF 93 at 13. But that court's analysis did not turn on the law's vintage. It instead focused on the plaintiff's insufficient showing of resource diversion. *Husted*, 770 F.3d at 459-60; *see also N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, No. 20-cv-876, 2020 WL 6488704, (M.D.N.C. Nov. 4, 2020) (finding organizational standing for organizations founded in 1965 and 2010 to challenge a

---

[1] Two of the Plaintiff groups have opposed Colorado Springs' election timing for over a decade. *See, e.g.*, Pls.' App'x at 502-548, Lee Decl. Exs. 53-60.

12

law first enacted in the 1870s). The plaintiff in *Husted* made "two evidentiary showings on summary judgment." 770 F.3d at 459. First, that its informational materials failed to accurately describe the law at issue (which the court explained was not an Article III injury and "not fairly traceable to the State"), *id.*; and second, that it had to instruct volunteers about the challenged policies during a training that was happening *anyway* as part of a regularly set meeting. *Id.* at 459-60. That is not analogous to what Plaintiffs here face. The City's April elections require them to duplicate efforts, not just alter the content of those efforts—they must engage in get-out-the-vote and civic education efforts *twice* that they otherwise would have to do *once* if municipal elections coincided with other elections.

*Husted* explained that this type of harm is precisely what Article III requires. The Order quoted *Husted* for the proposition that "if the armchair observer decides that the government is violating the law, and decides to stop it by suing, that is not enough." ECF 93 at 13 (quoting *Husted*, 770 F.3d at 460). But the Sixth Circuit contrasted the "armchair observer" with a "political party [that] can marshal its forces more effectively by winning its lawsuit," which would establish standing. *Husted*, 770 F.3d at 460. Plaintiffs are of course not political parties, but they *are* organizations who would be able to marshal their resources more effectively if they were successful in this suit. As the Sixth Circuit found in *Husted*, "that ought to be enough for Article III." *Id.*

Nothing in *Havens* suggests that an organization cannot be harmed by a policy that predates it. Consider the fact pattern there: the Supreme Court concluded that

13

an apartment owner's racially discriminatory steering practices made it more difficult for the plaintiff to counsel homeseekers. That difficulty exists whether the owner was discriminating against Black renters for decades or days. A policy can "perceptibly impair[]" an organization's ability to provide services and cause a "drain on the organization's resources" no matter how longstanding it is. *Havens*, 455 U.S. at 379. Plaintiffs must undertake their voter education and turnout efforts for an additional election every two years. That impairment does not turn on when the law scheduling those elections was enacted. In other voting contexts, courts have held that each election can constitute part of an ongoing injury, regardless of how long-standing a policy. *See Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990).

For similar reasons, the other case on which the Order relied does not undermine Plaintiffs' standing here. The Order cited *Make the Road New York v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019), in discussing "cases where a plaintiff was *already* providing the services at issue and therefore failed to allege any injury." ECF 93 at 12. But, as the Second Circuit explained on appeal in that case, the key dispute was whether the policy in question forced the organizations to expend resources or merely altered the content of work they would otherwise *still* do. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61 (2d Cir. 2020). The organizations there had standing because, for example, they held workshops devoted entirely to the challenged policy *on top of* other workshops they would do absent the policy. *Id.* at 62. They also funded efforts to inform their constituents about the implications of the policy. That is analogous to the Plaintiffs here (and unlike the *Husted* plaintiffs): the

City's April elections force them to make additional outreach and duplicate get-out-the-vote efforts—not merely to adjust the content of a single effort.

Finally, the other cases the Order referenced do not undermine Plaintiffs' standing. *Tennessee Conference of the NAACP v. Lee* turned principally on the relative weakness of the plaintiff's "conclusory declaration" that lacked "specific facts." 105 F.4th 888, 890, 907 (6th Cir. 2024) (per curiam). Here, by contrast, Plaintiffs have provided details in the form of testimony, budgets, voter guides, and documentation on volunteer recruitment that demonstrate the time, money, and other resources spent on April municipal elections. And the Sixth Circuit indicated that *FDA* did not undermine standing for an organization whose core "business" activities include voter registration and services. *Id.* at 905. And as Plaintiffs' injuries are not conjectural or dependent on a dubious causal chain, that distinguishes them from the plaintiffs in *Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394 (10th Cir. 1992), and *Murthy v. Missouri*, 144 S. Ct. 1972 (2024). Here, the causal chain is direct: the government policy of holding April municipal elections requires Plaintiffs to duplicate their core voter services efforts. And there is no speculation about the future: if the policy continues, it will continue to sap resources from Plaintiffs' other core programmatic activities, as it has in the past. That is a *Havens* harm.

## CONCLUSION

Plaintiffs respectfully request that this Court reconsider its prior decision, amend its judgment dismissing Plaintiffs' claim for lack of Article III standing.

Dated: August 5, 2024              Respectfully submitted,

<u>*/s/ Theresa J. Lee*</u>
Theresa J. Lee
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 549-2500
tlee@aclu.org

Daniel Hessel
Nicholas Stephanopoulos
ELECTION LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Suite 4105
Cambridge, MA 02138
(617) 496-0370
dhessel@law.harvard.edu
nstephanopoulos@law.harvard.edu

Timothy R. Macdonald
Emma Mclean-Riggs
AMERICAN CIVIL LIBERTIES UNION OF
    COLORADO
303 E. 17th Avenue, Suite 350
Denver, CO 80203
tmacdonald@aclu-co.org
emcleanriggs@aclu-co.org

*Attorneys for Plaintiffs*

# CERTIFICATION OF CONFERRAL

I, Theresa J. Lee, hereby certify that I conferred with Mr. Lewis and Mr. Raile, counsel for Defendants, via phone call on Friday, August 2. We discussed the bases for Plaintiffs' motion, namely the application of *Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*FDA*"), 602 U.S. 367 (2024), which post-dated the summary judgment briefing in this case. Defendants disagree with Plaintiffs regarding the application of *FDA* and indicated that they would oppose the motion.

/s/ Theresa J. Lee
Theresa J. Lee
Attorney for Plaintiffs

**CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE**

I, Theresa J. Lee, hereby certify that no portion of the forgoing Motion to Alter or Amend Judgment was drafted using Artificial Intelligence.

/s/ Theresa J. Lee
Theresa J. Lee
Attorney for Plaintiffs