**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CITIZENS PROJECT, COLORADO
LATINOS VOTE, LEAGUE OF
WOMEN VOTERS OF THE PIKES
PEAK REGION, and BLACK/LATINO
LEADERSHIP COALITION,

    *Plaintiffs*,

                  No. 22-cv-01365-SKC-MDB

v.

CITY OF COLORADO SPRINGS, and
SARAH BALL JOHNSON, in her
official capacity as City Clerk,

    *Defendants*.


**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ALTER OR AMEND**
**JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................i

**INTRODUCTION** ........................................................................................................1

**ARGUMENT**...............................................................................................................1

    I.    Reconsideration Is Appropriate. ............................................................................ 1

    II.    Plaintiffs Have Opposed the City's Unusual Election Timing for Years. ..... 4

    III.    Defendants Omit the Key Distinctions Between This Case and *FDA*. ......... 4

    IV.    Enjoining April Elections Would Redress Plaintiffs' Harms. ........................ 7

**CONCLUSION** ..........................................................................................................**10**

**CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE** ....**11**

## INTRODUCTION

Pursuant to Local Rule 7.1(d), Plaintiffs Citizens Project, Colorado Latinos Vote, League of Women Voters of the Pikes Peak Region (LWVPPR), and Black/Latino Leadership Coalition (BLLC) file this reply in support of their Motion to Alter or Amend Judgment. ECF 95.

Courts have a significant amount of discretion to alter their judgments. Here, Plaintiffs did not have reason to brief Article III standing because Defendants had not raised the issue in their opening motion, and the Order relied in large part on a decision that post-dated briefing and addressed an issue the parties had not briefed. In addition, Defendants' arguments that Plaintiffs lack Article III standing do not grapple with the key distinctions between this case and *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). They also do not address key facts in the record to insist that any harm is speculative. In fact, the harm is concrete, particularized, supported by the record, and redressable by the relief Plaintiffs seek. Plaintiffs respectfully submit that, under the distinct circumstances of this case, it would be appropriate for the Court to reconsider its Order.

## ARGUMENT

### I.   Reconsideration Is Appropriate.

Contrary to Defendants' suggestion, ECF 96 at 2, the Court has substantial discretion to reconsider its prior decision, *Pound v. Airosol Company*, 368 F. Supp. 2d 1158, 1159 (D. Kan. 2004) (citing *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 2004)). As Plaintiffs noted in their opening brief, the distinct circumstances of this case make it appropriate for the Court to reconsider its decision. ECF 95 at 2–4.

Defendants rely principally on several cases that are not analogous to this one. In *Casale v. Ecolab Inc.*, for example, the parties' dispute centered on whether the claim had to be brought in arbitration. No. 2:21-CV-00126-NT, 2022 WL 1910126, at *1 (D. Me. June 3, 2022). The plaintiff sought reconsideration of the order compelling arbitration, contending that "days" after briefing concluded, the First Circuit had "announced a new standard to be applied on a motion to compel arbitration." *Id.* at *3. In other words, the parties in that case had already briefed the key issue in the case; and, as the court there explained, the plaintiff could have responded to the new case by seeking to supplement that briefing. *Id.*; *see also* ECF 96 at 7–8 (citing cases in which purported change in law dealt with issues the parties had briefed, or in which reconsideration was granted on other grounds). Here, by contrast, the Defendants' summary judgment motion never argued that Plaintiffs lacked Article III standing, and their reply brief gave mere mention to that issue. ECF 95 at 2–3. As a result, the parties never had occasion to brief Article III standing—before or after *FDA* was issued—and no reason to supplement the briefing to address *FDA*.

To be clear, Plaintiffs do not claim that they were "blindsided by their standing burden." ECF 96 at 6. They recognize that standing is their burden to prove and that the Court may dismiss a case for lack of standing. But because Defendants did not advance the issue at summary judgment, Plaintiffs had no reason to submit all the evidence of diverted resources and harm that they had planned to show at trial. It would be inefficient (to parties and courts) to require a party to put forth all the evidence it intends to put forth at trial on a particular issue when responding to a

summary judgment motion that does not raise that issue. *Cf.* L.R. 56.1(c) (discouraging "[v]oluminous exhibits" on summary judgment and "limit[ing] exhibits to essential portions of documents").

Defendants' argument about the relationship between statutory and Article III standing is similarly beside the point. ECF 96 at 4–5. It is true that statutory standing cannot broaden Article III standing. *Id.* at 4. That does not mean that any argument about statutory standing necessarily subsumes and becomes an argument about Article III standing. Defendants' summary judgment arguments illustrate that point: they focused on their assertion that Congress did not intend to allow organizations to sue under the VRA—a statutory standing argument. They did not, as part of that argument, spend time discussing Article III requirements. In response, Plaintiffs focused on the arguments Defendants made; it was not necessary for Plaintiffs to fully brief Article III standing to address the arguments Defendants made on statutory standing. It would not promote the just, speedy, and inexpensive determination of a case to expect a party to present all potential evidence on every aspect of their case when submitting responsive summary judgment briefing, whether raised by the other party or not.

Ultimately, the Court has significant discretion here to tailor its decision to the unique circumstances of this case. The purpose of Rule 59(e) is to empower a district court to alter its decision "and so make an appeal altogether unnecessary." *Banister v. Davis*, 590 U.S. 504, 516 (2020). The Court should exercise that power here.

## II. Plaintiffs Have Opposed the City's Unusual Election Timing for Years.

In their opposition, Defendants state that Plaintiffs' concerns over the City's April election timing are newfound and lawyer-driven. ECF 96 at 1; *see also* ECF 60 at 3–5. That simply is not true. Plaintiff organizations Citizens Project and LWVPPR have opposed the City's April municipal elections for over a decade. *See* ECF 95-1 Lee Decl. Exs. 54–60 (extensive documentation of those efforts); *id.* at 59–60, Williams Tr. 170:6–172:8 (deponent discussing longtime opposition to April elections). They have done so because holding elections in April has the effect of reducing turnout. *See id.* at 537. Both these organizations—alongside their fellow Plaintiff organizations Colorado Latinos Vote and BLLC—are committed to promoting voter engagement, especially among traditionally underserved communities, so that government fairly represents the citizenry. They devote substantial volunteer hours and monetary resources to accomplishing that goal.

As they noted in their Rule 59 motion, Plaintiffs recognize that they cannot establish standing based on their longstanding efforts to oppose the City's April municipal election timing. ECF 95 at 12. But given Defendants' attempt to question Plaintiffs' sincerity, it is important to note that their concerns here are longstanding and genuine.

## III. Defendants Omit the Key Distinctions Between This Case and *FDA*.

Defendants do not meaningfully engage with the key distinctions between this case and *FDA*. Instead, they ignore these differences to depict this case as a mirror-image of *FDA*.

First, throughout their briefing, Defendants inaccurately relegate Plaintiffs' efforts to "advocacy" or "speech." ECF 96 at 9, 10–11, 12, 13.  This allows Defendants to make an inapt apples-to-apples comparison between the *FDA* plaintiff and Plaintiffs here. *See id.* at 9 ("The [*FDA*] plaintiffs . . . could not claim standing on the basis that government acts made their abortion-related advocacy more expensive. . . Here, Plaintiffs cannot claim standing based on City actions allegedly making their election-related advocacy more expensive."). But Plaintiffs here are not just advocates. They are voter services and civic education organizations. ECF 95 at 6–10. That distinguishes them from the *FDA* plaintiff, whose efforts were limited to advocacy. 602 U.S. at 395. The Supreme Court recognized this as a "[c]ritical[]" distinction between the *FDA* plaintiff and the *Havens* plaintiff. *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982)). The *Havens* plaintiff had standing to challenge action that "perceptibly impaired," *id.* (quoting *Havens*, 455 U.S. at 379), and "affected" its "core business activities," whereas the *FDA* plaintiff alleged harm to abstract advocacy efforts, *id.*

Just as the organization in *Havens* counseled and referred home-seekers—its "core business activity"—Plaintiffs here educate residents about policy issues and how to participate in civic life (including through elections). Even the Sixth Circuit case that Defendants cite recognized that a voter services organization may be understood as being "in the business of registering voters—not merely gathering information and advocating against the [challenged] law." *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 905 (6th Cir. 2024). As in *Havens*, the challenged behavior here

5

"perceptibly impairs" those core activities. *Havens*, 455 U.S. at 379. Many of Defendants' arguments are premised on this reframing of Plaintiffs' activities as abstract advocacy. They insist, for example, that to recognize Plaintiffs' standing means that "anyone could spend $2 on speech and sue because $1 would suffice if government only conducted its affairs in some other way." ECF 96 at 12. Not so. The issue here is not the cost of some newly established speech about a policy—it is the cost of Plaintiffs' core activities. Here, as in *Havens*, the challenged conduct makes Plaintiffs core *activities* more costly. *Havens*, 455 U.S. at 379.

Second, and relatedly, Defendants ignore that the plaintiff in *FDA* expended resources solely to oppose the policy it sought to challenge, whereas here, the resources are expended *because of* but not *in order to* oppose the policy. As Plaintiffs explained in their opening brief, that makes them totally unlike the *FDA* plaintiff, which engaged in advocacy only and sought to "spend its way into standing simply by expending money to gather information and advocate *against the defendant's action*." 602 U.S. at 394.  *See* ECF 95 at 10–12. Defendants miss this distinction. They point out that the *FDA* plaintiff "could not claim standing on the basis that government acts made their abortion-related advocacy more expensive." ECF 96 at 9. True enough, but it does not follow that Plaintiffs here are similarly positioned to the *FDA* plaintiff: standing here does not flow from Plaintiffs' "election-related advocacy." *Id*. It flows from their core activities apart from any advocacy.

Indeed, to sustain their position, Defendants seemingly ascribe to the Supreme Court a surreptitious overruling of precedent (in addition to suggesting that three

courts of appeal have gotten *Havens* wrong, *see id.* at 14). *See id.* at 10. Defendants

insist that the *Havens* "framework is indeed upended." *Id.* The Supreme Court,

however, said no such thing. To the contrary, it discussed *Havens* favorably. And

while the Court did note that it "has been careful not to extend the *Havens* holding

beyond its context," as Plaintiffs described in their opening brief and above, the

*Havens* context parallels the facts here: organizations challenging a policy that

"perceptibly impairs" them in a concrete and particularized way by forcing them to

divert resources away from their core activities. ECF 95 at 5–10. The plaintiff in *FDA*

could not clear that bar, and the Supreme Court declined to lower that bar—it simply

refused to allow an organization to manufacture standing by spending resources in

advocating against the very policy it seeks to challenge in court. But it did not

overrule or upend *Havens*.

## IV.     Enjoining April Elections Would Redress Plaintiffs' Harms.

Defendants are incorrect in suggesting that an injunction barring April

municipal elections would not alleviate the harms Plaintiffs experience and that the

harms are speculative.

First, Defendants deploy a strawman, pointing out that Plaintiffs do not

challenge November odd-year elections and would thus still have to mobilize voters

more than once. ECF 96 at 1, 12. But reducing the number of elections—whether from

three to two or two to one—would stem the resource drain. If the Court were to grant

Plaintiffs relief, enjoining April municipal election timing, it would allow Plaintiffs to

conserve resources whether the elections were consolidated with November odd-year

or November even-year elections. The record in this case demonstrates that the

springtime election timing is particularly harmful to Plaintiffs, because it forces them to expend get-out-the-vote resources at a time where they would otherwise focus on other programmatic activities. Citizens Project's legislative report card, for example, reflects the organization's government monitoring and public education efforts that *must* take place during the spring to coincide with the state's legislative session. ECF 95-1 at 359–82, Lee Decl. Exs. 27–28; *contra* ECF 96 at 12–13 (suggesting the timing could change). Citizens Project's deponent testified that April elections divert resources—volunteer hours and attention—away from that effort. ECF 95-1 at 64–5, 36, 39–40, Williams Tr. 190:16–19, 192:1–14. Similarly, the LWVPPR's deponent testified that the April municipal elections sap time and energy from its community conversations that occur in the spring. *Id*. at 136, Roehrs Tr. 169:17–22, 170:1–16. And Colorado Latinos Vote's deponent testified that they could use the springtime months to expand their voter registration efforts elsewhere in southern Colorado. *Id*. at 169, Montoya Tr. 87:6–19. This harm is concrete: even if holding an extra election does not literally double the cost of *every single* voter education effort,[1] it requires planning and volunteer time and energy in the early portion of the year, which would otherwise be devoted to other core activities. Springtime elections, in particular, require extra mobilization efforts because voters and volunteers expect elections to occur in November. *See* ECF 95-1 at 24, Williams Tr. 29:19–31:12 (describing low voter-turnout survey findings, including fact that voters expect November elections).

---

[1] Though it does double the get-out-the-vote efforts. *See infra* at 9.

Relatedly, Defendants are incorrect that it is "speculative" that Plaintiffs' harms would be ameliorated by victory in this case. ECF 96 at 12–14. In insisting that "[c]oncurrent elections would change the timing of costs but nothing else," *id.* at 12, Defendants ignore the costs of get-out-the-vote efforts. That allows them to gloss over the simple fact that turning out voters twice (or three times) is harder than turning out voters once (or twice). It requires more money, volunteer hours, and planning. ECF 95-1 at 137, Roehrs Tr. 173:13–14 ("in the spring municipal, you're doing double the effort, double the time and money"); ECF 95-1 at 233 (budget reflecting "two elections" in a calendar year). Each of the organizations has detailed the efforts they undertake to remind voters of elections and encourage participation. *See* ECF 95 at 6–10. Documentary evidence—in the form of budgets, email blasts, and internal meeting minutes, among other things—supports this. *See id.*

Defendants rely on inapposite cases to suggest these harms are speculative. First, in *Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394 (10th Cir. 1992), a political party alleged that it had to "bear a greater burden in its attempt to pass [a constitutional] amendment" because the Governor used public resources to oppose it. 963 F.2d at 1396–97. The Tenth Circuit rejected that argument as "requir[ing] th[e] court to engage in a futile act of speculation in order to determine the extent of some remote, uncertain injury," where the plaintiffs' "spending [of] additional funds simply [could not] be traced to the Governor's allegedly illegal expenditures." *Id.* at 1397. Here, by contrast, Plaintiffs provide concrete services (as opposed to holding abstract political positions) and have presented evidence of the funds and volunteer hours

9

spent as a result of the challenged policy. That evidence also distinguishes this case from *Tennessee Conference of the NAACP v. Lee*, which dealt with a record based "primarily" on a single "conclusory declaration" that did not allege any facts tied to the policy the plaintiffs there challenged. 105 F.4th at 904, 907. Against that backdrop, the harm alleged may have required speculation. Here, it does not: there is substantial documentary and testimonial evidence about money and efforts spent on April elections. Plaintiffs should not have to cite evidence from a counterfactual universe without April elections in order to establish standing, and Defendants cite no case to support that notion.

## CONCLUSION

Plaintiffs respectfully request that this Court reconsider its prior decision and amend its judgement dismissing Plaintiffs' claim for lack of Article III standing.


Dated:        September 9, 2024            Respectfully submitted,


/s/ Theresa J. Lee
Theresa J. Lee
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 549-2500
tlee@aclu.org

Daniel Hessel
Nicholas Stephanopoulos
ELECTION LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Suite 4105
Cambridge, MA 02138
(617) 496-0370
dhessel@law.harvard.edu
nstephanopoulos@law.harvard.edu

10

Timothy R. Macdonald
Emma Mclean-Riggs
AMERICAN CIVIL LIBERTIES UNION OF
   COLORADO
303 E. 17th Avenue, Suite 350
Denver, CO 80203
tmacdonald@aclu-co.org
emcleanriggs@aclu-co.org

*Attorneys for Plaintiffs*

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

I, Theresa J. Lee, hereby certify that no portion of the forgoing Motion to

Alter or Amend Judgment was drafted using Artificial Intelligence.

/s/ Theresa J. Lee
Theresa J. Lee
Attorney for Plaintiffs